903 So.2d 1071 (2005)
WILLIS-KNIGHTON MEDICAL CENTER
v.
CADDO-SHREVEPORT SALES AND USE TAX COMMISSION.
No. 2004-C-0473.
Supreme Court of Louisiana.
April 1, 2005.
Opinion on Rehearing June 22, 2005.
*1073 Oreck, Bradley, Crighton, Adams & Chase, Jesse R. Adams, III, Andre Brian Burvant, New Orleans, for Applicant.
Barham & Warner, Richard G. Barham, Shreveport, for Respondent.
Timothy Benedict Francis, James Michael Garner, Peter L. Hilbert, Jr., Steven *1074 I. Klein, New Orleans, for Amicus Curiae Tuoro Infirmary.
WEIMER, Justice.
This is a suit for refund of sales and use taxes paid under protest. We granted certiorari to address the taxpayer's contention that the court of appeal erred in determining that no refund was due for taxes levied on sales of medical devices used by patients to treat diseases under the supervision of and prescribed by their treating physicians and on repairs and maintenance to medical equipment allegedly incorporated into the structure of taxpayer's buildings so as to become immovable property. In addressing the latter issue, we are called upon to resolve a significant controversy related to the proper interpretation of LSA-C.C. art. 466 and its definition of a component part. See and compare, Equibank v. United States Internal Revenue Service, 749 F.2d 1176 (5th Cir.1985) and Prytania Park Hotel, Ltd. v. General Star Indemnity Co., 179 F.3d 169 (5th Cir.1999). See also, John A. Lovett, Another Great Debate?: The Ambiguous Relationship Between the Revised Civil Code and Pre-Revision Jurisprudence as seen through the Prytania Park Controversy, 48 Loy. L.Rev. 615 (2002) (hereinafter Lovett) and articles cited at footnote 6, infra. After careful review of the issue, we conclude that Article 466 must be applied as written. The article requires only that a component part of an immovable be "permanently attached," a term defined in the article as that which cannot be removed without substantial damage to itself or to the immovable to which it is attached. In reaching this conclusion, we expressly reject the societal expectations test as a means of determining component parts of immovables, and a disjunctive reading of the two paragraphs of Article 466 as creating two independent types of component parts. Finding no error in the ultimate result reached by the court of appeal, we affirm the decision of that court and remand the matter to the district court for further proceedings consistent with our ruling herein.

FACTS AND PROCEDURAL BACKGROUND
Willis-Knighton Medical Center (Willis-Knighton) operates three not-for-profit hospitals in Caddo Parish, and in connection therewith pays sales and use taxes collected by the Caddo-Shreveport Sales and Use Tax Commission (the Commission). By letters dated December 18, 1996, March 6, 1997, and December 16, 1997, respectively, Willis-Knighton wrote the Commission to request a refund or credit for sales and use tax it allegedly overpaid from December 1992 through December 1996. Basically, Willis-Knighton claimed an exemption or exclusion from local sales and use taxes for its purchases of food for resale to patients, medical devices, albumin and other blood products, and for repairs and maintenance on immovable medical equipment. The Commission denied the requests for a refund or credit in early January 1998.
Shortly thereafter, Willis-Knighton filed its monthly tax return for the period December 1 through December 31, 1997. In conjunction therewith, it advised the Commission that $47,221.37 was being paid under protest. On January 29, 1998, Willis-Knighton filed the instant suit, demanding a refund of the $47,221.37 paid under protest. It also demanded $568,984.09 for the alleged overpayments between December 1992 and December 1996.
In the suit, Willis-Knighton claimed that it owed no local sales and use taxes for the following: (1) albumin and other blood products, allegedly exempt under statutes that define "human tissue transplants" to include "blood, or blood products" transplanted *1075 into a recipient individual, LSA-R.S. 47:301(10)(d), LSA-R.S.33:2717; (2) medical devices used by patients to treat diseases under the supervision of and prescribed by their treating physicians, allegedly exempt under LSA-R.S. 47:305(D)(1)(s); and (3) repairs and maintenance on medical equipment allegedly incorporated into the structure of Willis-Knighton's buildings so as to become immovable and thus not taxable under the relevant provisions of the city and parish ordinance, which apply only to repairs of tangible personal property. See, Shreveport, LA, Ordinances, Appendix B, Sales and Use Tax § 1.17 (2000).[1] The Commission answered the suit, denying Willis-Knighton's entitlement to a refund.
Following a district court ruling denying cross motions for summary judgment, the case was set for trial. Just prior to trial, the Commission filed an exception of no right of action, averring that Willis-Knighton had no right of action for a refund of taxes which were not paid under protest. The exception was referred to the merits.
On the morning of trial, the parties appeared and announced that they had reached an agreement with respect to all issues except: the exception of no right of action; the exempt status of medical devices; the exempt status of albumin and other blood products; and whether certain pieces of medical equipment (specifically, nuclear cameras owned by Willis-Knighton) had been immobilized and were component parts such that repairs and maintenance to the cameras were not taxable. The parties agreed to try the issues of liability and the amount of taxes due separately. Witnesses were called and evidence received. At the conclusion of testimony, the district court took the case under advisement, and on December 16, 2002, the court issued a written ruling.
The district court first overruled the Commission's exception of no right of action with respect to sales and uses taxes voluntarily remitted without protest from December 1, 1992, through December 31, 1996, concluding that "Section 10 of the Combined Ordinances provides a procedure for the refund of taxes paid without protest and in error when the claim is made within three years." On the merits, the district court found that Willis-Knighton's nuclear cameras are "other installations" and thus component parts within the meaning of LSA-C.C. art. 466, are permanently attached to the hospital building, and, as a result, are immovable property under Louisiana law. The court ruled that inasmuch as the cameras are immovable property, Willis-Knighton is entitled to a refund of all local sales and use taxes paid on maintenance and repairs to the nuclear cameras. Next, it found that medical devices were specifically exempt from local sales and use taxes under LSA-R.S. 47:305(D)(1)(s), as enacted in 1985, and that a 1991 amendment to subsection D(6) did not alter that exemption. Accordingly, the district court ruled that Willis-Knighton is entitled to a refund of all local sales and use taxes paid on medical devices. Finally, the district court found that blood and blood products are exempted from local sales and use taxes only if they are "transplanted from one individual into another recipient individual." LSA-R.S. 33:2717.[2] Because modern technology is such that blood products are derived from multiple donor pools and because exemptions must be strictly construed *1076 against the taxpayer, the court ruled that Willis-Knighton is not entitled to a refund of local sales and use taxes paid on blood and blood products.
Following the district court's ruling as to liability, the parties agreed as to the dollar amounts due, rendering unnecessary a trial as to the amount of taxes due. Final judgment was rendered on March 28, 2003, ordering the Commission to refund overpayments of $6,724.93 for taxes on maintenance and repair to Willis-Knighton's nuclear cameras and $356,551.03 for taxes on medical devices, paid without protest by Willis-Knighton from December 1992 through December 1996. The judgment also ordered a refund of $21,877.80 for taxes on maintenance and repair to the nuclear cameras and $6,850,617.23 for taxes on medical devices, paid under protest since January 1998, together with any such taxes paid under protest since trial. All awards were subject to judicial interest. The judgment denied Willis-Knighton's claims for a refund of taxes paid on blood and blood products. Both parties appealed.
On appeal, the second circuit reversed the district court's ruling in its entirety. Willis-Knighton Medical Center v. Caddo-Shreveport Sales, 37,914 (La.App. 2 Cir. 12/10/03), 862 So.2d 358. First, the court held that the district court erred in overruling the Commission's exception of no right of action as to Willis-Knighton's demand for a refund of sales and use taxes paid without protest, finding that while Section 10.04 of the Combined Ordinances does establish a procedure for obtaining a refund of taxes paid without protest, that procedure is available only in the absence of questions of fact or law, and when the payments have been erroneous. Citing Kean's Partnership v. Parish of East Baton Rouge, 96-0751 (La.11/25/96), 685 So.2d 1043, the court of appeal held that judicial review of the entitlement to a refund of taxes paid without protest is limited to a review of the Administrator's determination as to the existence of a genuine issue of law or fact. In this instance, there was a finding by the Administrator of the existence of factual and legal issues with regard to whether taxes were owed on medical devices, blood and blood products, and repair and maintenance to the nuclear cameras. This finding was not clearly wrong; therefore, as to taxes paid without protest, Willis-Knighton was entitled to no further relief. The judgment of the district court was reversed insofar as it ordered the refund of taxes that were not paid under protest.
Next, the court of appeal examined whether the district court erred in ruling that Willis-Knighton's nuclear cameras are component parts and thus should be characterized as immovable property, and as such, exempt from local sales and use taxes. In doing so, the court of appeal agreed with the district court's determination that LSA-C.C. art. 466 controls this issue. Holding that the two paragraphs of Article 466 are separate and distinct and should be applied independently to determine whether a particular object is a component part of an immovable, the court of appeal also noted that in addition to this two-step analysis, the jurisprudence has applied a "societal expectations" test to determine whether various items not enumerated in the first paragraph of Article 466 should nevertheless be deemed permanently attached for purposes of that first paragraph. While, ultimately, the court of appeal agreed with the district court's decision to engage in a societal expectations analysis in this case, it disagreed with its methodology, holding that the proper inquiry under this test is not whether society expects a hospital to contain nuclear cameras, but whether a commercial building must contain nuclear cameras to meet societal expectations. Concluding that society does not expect to see nuclear cameras *1077 in a commercial building, the court of appeal held that the district court erred in finding that the nuclear cameras were components of Willis-Knighton's hospital buildings under the first paragraph of Article 466. It also held that the district court was plainly wrong to find that the nuclear cameras were permanently attached to the buildings within the contemplation of the second paragraph of Article 466, as the evidence reveals that removing the cameras would not cause substantial damage to either the cameras or the buildings. Accordingly, the court of appeal reversed that portion of the district court judgment ordering a refund of local sales and use taxes for repair and maintenance to the nuclear cameras.
The court of appeal then addressed the exemption of medical devices from local sales and use taxes. It recognized that LSA-R.S. 47:305(D), the statute which exempts medical devices from state sales and use taxes, was amended in 1991. Prior to the amendment, medical devices were exempt from both local and state taxation by virtue of LSA-R.S. 47:305(D)(6). After the amendment, the exemptions in existence as of June 29, 1978, the effective date of Act 205 of 1978, apply to local sales and use taxes unless otherwise specifically provided; exemptions placed in Section 305(D) after the 1991 Regular Session, to be effective, must specifically state in the title and body of the bill that they are to be applicable at the local level. The exemption for medical devices was not in existence as of the effective date of Act 205 of 1978, and it was not placed in the Section after the 1991 regular session. Recognizing that the 1991 amendment "officially skirted" the validity of exemptions, such as the medical device exemption, placed in the statute between 1978 and 1991, the court of appeal nevertheless held that the plain effect of the amendment was to remove any exemption from local sales and use taxes unless the exemption clearly applied to local taxes. No legislation clearly provides that the medical device exemption, set forth in LSA-R.S. 47:305(D)(1)(s), applies at the local level. As a result, the court of appeal held that the district court erred in determining that medical devices were exempt from local sales and use taxes and reversed that portion of the district court judgment ordering a refund of local sales and use taxes for the sale of medical devices.
Finally, the court of appeal re-visited the district court's determination that blood and blood products are not exempt from local sales and use taxes. Acknowledging that the relevant statute, LSA-R.S. 33:2717, exempts from local taxation blood and blood products transplanted from "one individual," and that most transfusions consist of blood products taken from multiple donors as hospitals rarely transfuse whole blood from one donor into one recipient, the court of appeal nevertheless held that to apply the exemption solely to one-on-one transplants would defeat the obvious purpose of the law. It therefore held that the district court erred in denying Willis-Knighton the requested refund as to blood and blood products. It reversed that portion of the judgment denying a refund of taxes paid under protest for the sale of blood and blood products and awarded Willis-Knighton $99,347.90, representing taxes paid on blood and blood products under protest through the time of trial, any taxes paid under protest after trial, and judicial interest from the date those taxes were paid. Judgment was rendered accordingly.
Following the denial of rehearing by the court of appeal, Willis-Knighton applied to this court for review. We granted certiorari to address Willis-Knighton's contention that the court of appeal erred in ruling (1) that its nuclear cameras are not component parts of its buildings and therefore immovable property within the meaning *1078 of LSA-C.C. art. 466; and (2) that sales of medical devices are not exempt from local sales and use taxes after the 1991 amendment of LSA-R.S. 47:305(D)(6).[3]Willis-Knighton Medical Center v. Caddo-Shreveport Sales and Use Tax Commission, 04-0473 (La.5/21/04), 874 So.2d 159.

LAW AND ANALYSIS

I. NUCLEAR CAMERAS AS COMPONENT PARTS
Willis-Knighton has two types of nuclear cameras installed on its premisesa GE Medical and an ADAC Laboratories nuclear camera. The first issue this court is called upon to address is whether these cameras, otherwise distinct movables, are component parts of the hospital building and therefore immovable property. The classification of the cameras as a component part of immovable property, and therefore immovables themselves, is important because pursuant to the relevant ordinances, only repairs to tangible personal property[4] are subject to sales and use tax. Clyde Juneau Co., Inc. v. Caddo-Shreveport Sales and Use Tax Com'n, 28,433 (La.App. 2 Cir. 6/26/96), 677 So.2d 610, 611-612. If the nuclear cameras are component parts of the hospital building, and thus immovables, Willis-Knighton is not subject to sales and use tax on repair and maintenance contracts for those cameras.
To determine whether property is movable or immovable for purposes of the sales and use tax, it is appropriate to turn to the relevant provisions of the Civil Code. South Central Bell Telephone Co. v. Barthelemy, 94-0499 (La.10/17/94), 643 So.2d 1240, 1243. As we explained in South Central Bell, the application of property law concepts in the tax context is an exception to the general rule that tax laws are sui generis. It is based on the reasoning that the use of common law terminology in the tax laws was not intended to import the common law into Louisiana for purposes of sales and use tax law, nor to require the development of an entirely new body of property law for sales and use tax purposes only, but, rather the terminology was intended to be interpreted consistently with our civilian property concepts embodied in the Civil Code. Id.
In this instance, whether otherwise movable property, such as a nuclear camera, has become a component part of an immovable and therefore subject to the laws governing immovable property is determined by application of Civil Code articles 465, 466, and 467. Those articles provide as follows:
Art. 465. Things incorporated into an immovable
Things incorporated into a tract of land, a building, or other construction, so as to become an integral part of it, *1079 such as building materials, are its component parts.
Art. 466. Component parts of buildings or other constructions
Things permanently attached to a building or other construction, such as plumbing, heating, cooling, electrical or other installations, are its component parts.
Things are considered permanently attached if they cannot be removed without substantial damage to themselves or to the immovable to which they are attached.
Art. 467. Immovables by declaration
The owner of an immovable may declare that machinery, appliances, and equipment owned by him and placed on the immovable, other than his private residence, for its service and improvement are deemed to be its component parts. The declaration shall be filed for registry in the conveyance records of the parish in which the immovable is located.
Pursuant to these articles, things may become a component part of an immovable in one of three ways: by incorporation into a building or other construction (Article 465), by permanent attachment thereto (Article 466), or by declaration of the owner (Article 467).[5] 2 A.N. YIANNOPOULOS, LOUISIANA CIVIL LAW TREATISE: PROPERTY, § 142 (4th ed.2001). In the instant case, both lower courts relied on LSA-C.C. art. 466 and the concept of permanent attachment embodied therein to determine whether Willis-Knighton's nuclear cameras were immovables and, as such, free from taxation on repair and maintenance contracts, in the process coming to entirely different conclusions on the same basic law and facts. The disparity in results is troubling, yet understandable.
As it turns out, Article 466 is at the epicenter of a debate that "raises serious questions about civilian methodology in general and specifically about the role of pre-revision jurisprudence in interpreting a revised Civil Code." Lovett, 48 Loy. L.Rev. at 620. Its proper interpretation, as evidenced in the diametrically opposed federal court decisions of Equibank v. United States Internal Revenue Service, 749 F.2d 1176 (5th Cir.1985) and Prytania Park Hotel, Ltd. v. General Star Indemnity Co., 179 F.3d 169 (5th Cir.1999), has "spawned a civilian cause-celebre," resulting in extensive academic commentary and debate[6] that pits some of Louisiana's most well-respected scholars and academicians (notably Professors A.N. Yiannopoulos and Symeon Symeonides) against Judge Jacques L. Wiener, Jr. and the U.S. Fifth Circuit Court of Appeals.[7] Lovett, 48 Loy. L.Rev. at 620. At the heart of this debate is the extent to which jurisprudence *1080 pre-dating the 1978 revision of Title 1 of Book II of the Civil Code of 1870 (the Code's property law articles governing the distinction between movables and immovables) survived that revision and the status of such jurisprudence in the civilian methodology. In other words, the debate pits civilian purists who would see the Civil Code as a comprehensive enactment designed to be complete within its area of application and intended to break with the past against pragmatists who would look to former Civil Code articles and pre-revision judicial decisions to find in these texts another layer of legal sources that amend or modify the text of the revised Civil Code, in effect rendering the Code more like a digest than a true Civil Code.
The opposing sides of what Professor Lovett characterizes in his law review article as the "Great Debate" about the purity of Louisiana's civil law system are epitomized in the competing interpretations accorded LSA-C.C. art. 466 in the Equibank and Prytania Park decisions.
In Equibank, the owners of a St. Charles Avenue mansion failed to pay their income tax and defaulted on their mortgages. Pursuant to its federal tax lien, the I.R.S. seized the home and removed several expensive chandeliers. The plaintiff, a bank that held a second mortgage on the home which primed the I.R.S. lien, demanded that the I.R.S. return the chandeliers, contending that they were component parts of the house and thus subject to the priming second mortgage. The district court ruled in favor of the I.R.S., but the court of appeal reversed. In doing so, however, both courts looked to Article 466 and the testimony of Professor Yiannopoulos, who was called as an expert by the I.R.S. to testify in the district court.
Professor Yiannopoulos testified that Article 466 sets forth two ways in which a thing becomes a component part. First, under paragraph one of the article, a thing that fits within a listed category (plumbing, heating, cooling, electrical, or other installation) is a component part as a matter of law, regardless of its degree of attachment. Second, under paragraph two of the article, a thing is a component part if its removal would cause "substantial damage" to itself or to the immovable to which it is attached.
In accordance with this disjunctive interpretation of Article 466, Judge Henry A. Politz, writing for the Equibank court, applied paragraph one of Article 466 independently of paragraph two. Finding that the chandeliers were in fact removed without substantial damage to them or to the house to which they were attached, the court determined that they could not be considered component parts under the second paragraph of Article 466. The focus of the opinion then turned to paragraph one and whether, under that paragraph, a chandelier is an "electrical installation." Article 466 does not define "electrical installation." However, the court found guidance for its resolution of this issue in what is now commonly known as the "societal expectations theory."
The societal expectations theory actually finds its genesis in Lafleur v. Foret, 213 So.2d 141 (La.App. 3 Cir.1968), an opinion authored by then-Judge Albert Tate, Jr. which interpreted pre-revision Civil Code provisions.[8] In that case, in determining whether window air-conditioning units *1081 were immovables by nature under former LSA-C.C. art. 467, Judge Tate noted that the list of items enumerated as being immovables by nature in the former code article is not exclusive, and that the task when dealing with non-enumerated items is to "determin[e] what class or type of non-enumerated movables are to be included within Article 467's coverage and thus susceptible of immobilization by its provisions." Id. at 147. Judge Tate declared that "the proper standard to apply in the case here (where the parties have not specified their subjective intent on the matter) is a determination of whether the non-enumerated item, is, according to contemporary objective standards, a component of the immovable." Id. at 148. Under that test, Judge Tate explained, the court looks to "(i) contemporary views as to conceptions of components in light of current house construction practices, and (ii) the degree of connection or attachment to the building." Id.
It was this language the Equibank court relied on, in addition to language in the Expose des Motifs[9] and in Professor Yiannopoulos' Civil Law Treatise on Property, to conclude that "the views of the public on which items are ordinarily regarded as part of a building must be considered in defining those items which the legislature meant to include within the term electrical installation." Equibank, 749 F.2d at 1179. In classifying the chandeliers as immovables, the court posed the "near-rhetorical question:"
Does the average, ordinary, prudent person buying a home expect the light fixtures to be there when he or she arrives to take possession? Does that person expect the room to become illuminated when the light switch is thrown or should that person reasonably expect no response to the switch and, upon looking up, reasonably expect to see only a hole in the ceiling with the interior house wiring sticking out of the electrical workbox? In our view, the societal expectation is to have the lights go on.
Equibank, 749 F.2d at 1180.[10]
Over the next fifteen years, the Fifth Circuit's interpretation of Article 466 in Equibank, and its resort to the consideration of societal expectations along with its declaration of the disjunctive nature of the two paragraphs of Article 466, gained acceptance in the federal courts, which in turn influenced Louisiana's intermediate state appellate courts.[11]
*1082 One notable example of the way in which Louisiana's intermediate appellate courts were influenced by Equibank is found in the decision of the second circuit in Hyman v. Ross, 26,096 (La.App. 2 Cir.1994), 643 So.2d 256. In that case, the court of appeal applied the Equibank rationale and added Professor Symeonides' explanation of Article 466.
In an article published in the Louisiana Law Review,[12] Professor Symeonides acknowledged that a literal reading of Article 466 "strongly" suggests that its two paragraphs are "closely interdependent, and that the second paragraph is but a guide for applying the first paragraph, and more particularly for defining the meaning of the phrase `permanently attached.'" Symeonides, 46 La. L.Rev. at 687. Nevertheless, he postulated that although a literal interpretation of the article is plausible, it would be "historically and functionally incorrect." Id. According to Professor Symeonides, the paragraphs originated from different articles of the Civil Code of 1870, and those articles contemplated different degrees of attachment. Therefore, the phrase "permanently attached" in paragraph two refers to physical permanence, whereas the same phrase in paragraph one refers to temporal permanence. Temporal permanence means that the item is "viewed by the community as permanently serving the immovable" even though it might be only loosely attached. Thus read, Symeonides explains, paragraph one of Article 466 is consistent with its source provision, former Article 467, and the second paragraph is likewise consistent with its source provision, former Article 469, and the jurisprudence interpreting those former code articles.
The Hyman court concluded that heating and air conditioning units installed in motel rooms were component parts as a matter of law under paragraph one of Article 466. Applying Symeonides' interpretation, the court reasoned that the units were attached "indefinitely" and therefore permanently attached in a temporal sense. The court also reasoned, following Equibank, that the societal expectation is that the units are component parts because a purchaser of the motel would expect them to remain; otherwise a large gaping hole would be left in the outside wall of every room.
As illustrated by Hyman, the Equibank decision became the unofficial guide for interpretation of LSA-C.C. art. 466. Its rationale, with the judicial gloss added to the clear words of the article, remained the dominant theory, but did not go entirely unquestioned. See, Boggs v. Atlantic Richfield Co., 720 F.Supp. 72 (E.D.La.1989).[13] Then, in 1999, the U.S. Fifth Circuit rendered its landmark decision in Prytania Park, repudiating the Equibank analysis in its entirety.
The underlying legal dispute in Prytania Park concerned a claim for insurance coverage by the owners of a New Orleans hotel that had been damaged by a fire. The hotel was insured by a policy issued by General Star Indemnity. The policy covered (1) loss or damage to the building, including permanently installed fixtures and machinery, at full replacement value, and (2) loss or damage to furniture at *1083 actual cash value. In hopes of getting full replacement value, the owners of the hotel submitted a claim including custom built furniture that had been attached by screws and bolts to the walls of the guest rooms. The insurer paid only part of the claim, refusing to pay for the "fixtures" attached to the wall at full replacement value. The owners filed a breach of contract action seeking to recover the portion of their claim that was unpaid.
In determining whether the furniture could be considered "permanently installed fixtures" within the meaning of the insurance policy, the court of appeal turned to LSA-C.C. art. 466 to analyze whether the furniture had become permanently attached, i.e., a component part of the building. For the first time, the court, through Judge Jacques L. Wiener, Jr., interpreted Article 466 literally, holding that its two paragraphs are interdependent, with paragraph two defining how the items in paragraph one must be attached. Specifically, the court ruled that the list of items in the first paragraph of Article 466 is an "illustrative, ejusdem generis list" of movables that are susceptible of component part status "by virtue of permanent attachment." Prytania Park Hotel, Ltd., 179 F.3d at 179. Because the damaged hotel furniture was not a "plumbing, heating, cooling or electrical" installation, the court reasoned that it could only be considered a component part of the hotel building if it was an "other installation." Assuming for the sake of argument that the furniture could be classified as an "other installation," the court nevertheless went on to hold that the furniture failed to satisfy the second condition for classification as a component part because, as a matter of undisputed fact, removal of the furniture would not cause substantial damage either to itself or to the building. Since the furniture was not permanently attached within the contemplation of the article's second paragraph, the court held that it could not be included in the owner's insurance claim as "permanently installed fixtures" for which full replacement value was owed.
In reaching its conclusion, the court of appeals roundly criticized the rationale of Equibank and its importation of the societal expectations test. First, the court noted that a plain reading of Article 466 does not justify the Equibank court's interpretation of the article as having created two disjunctive categories of permanently attached component parts, commenting that Equibank requires "an imaginative parsing of th[e] article to visualize an otherwise invisible disjunctive between the article's first and second paragraphs." Prytania Park Hotel, Ltd., 179 F.3d at 181. Citing Professor Symeonides' law review article (discussed supra in connection with Hyman) acknowledging that "`a literal reading' ... of article 466 requires application of the `permanently attached' test to all installations, both the four nominate categories and all others that are `sufficiently similar ... thereto,'" Id. at 181 n. 34, the court of appeal rejected a disjunctive interpretation of Article 466 in favor of a literal "plain meaning" approach to the problem of classifying component parts.
Second, the court of appeal completely rejected the societal expectations test, calling its pedigree "murky at best." Id. The court noted that neither the text of the revised article nor its official revision comments mention the concept of societal expectations. It then noted that the sole allusion to "prevailing ideas in society" in the Expose des Motifs occurs in that text's introductory discussion of historical distinctions between movables and immovables and that this statement is qualified by the Expose's observation that in contemporary civil law "physical notions of mobility" and "inherent characteristics" determine this distinction. Id. Further, *1084 after reviewing the records of the Council of the Louisiana State Law Institute with respect to revised Article 466, the court noted that the notion of societal expectations did not surface in the drafting session devoted to Article 466. Id. Finally, the court of appeal theorized that the Equibank court never actually adopted the theory and that its discussion of societal expectations was merely for the sake of argument and "to turn that theory back on ... Professor [Yiannopoulos]." Prytania Park, 179 F.3d at 182 n. 35.
In effect, the Prytania Park decision called into question the validity of the judicial and doctrinal theory that had emerged following the Equibank decision, rejecting the societal expectations test and interpreting Article 466 in a more literal and unitary fashion. Judge Wiener's opinion in that case has sparked much criticism from the commentators, most notable among them Professor Yiannopoulos.[14] It has received little attention in Louisiana courts, and in fact was not even mentioned in connection with the instant case, the dispute here centering on how to apply the societal expectations test and not whether to apply it.
In the only occasion this court has had to address the code article, it did not directly confront the issue of the proper interpretation to be given Article 466 in light of the Equibank/Prytania Park split. In Showboat Star Partnership v. Slaughter, 00-1227 (La.4/3/01), 789 So.2d 554, this court demonstrated ambivalence on the issue, in effect sending mixed signals. Showboat Star Partnership addressed whether certain gaming equipment was a component part of a riverboat casino and thus exempt from state sales and use taxes under an exemption for equipment and machinery incorporated into and made "component parts" of a vessel. Because the relevant statute did not define "component parts," this court turned to Article 466 for guidance.
The court began by acknowledging that "judicial interpretations of Article 466 have not been consistent," but noted that "the courts generally have applied a societal expectations analysis." Showboat Star Partnership, 00-1227 at 7, 789 So.2d at 558. In a lengthy footnote, the court reviewed the jurisprudential development of the societal expectations analysis and noted that the analysis was generally followed by the courts until the Fifth Circuit "questioned the reasoning of the Equibank decision" in Prytania Park. Showboat Star Partnership, 00-1227 at 7, 789 So.2d at 559 n. 4. The court did not expressly disapprove of the Prytania Park analysis; it simply criticized the Fifth Circuit for attributing the origin of the societal expectations test to Equibank and not to Lafleur. While the court ultimately conducted a societal expectations analysis to conclude that "the average prudent business entity buying a vessel would not expect, in the absence of specific contractual provisions to the contrary, gaming equipment to be permanently attached to the vessel when the buyer took possession," Showboat Star Partnership, 00-1227 at 9, 789 So.2d at 560, the court went on to consider the "permanent attachment" standard of the second paragraph of Article 466. In doing so, the court remanded the case to the district court for it to determine whether certain items, such as signs and surveillance equipment, constituted component parts because some of *1085 the items appeared to be "attached electrically" and thus not "easily moved," suggesting by implication that, in the end, the permanent attachment standard might prevail over the societal expectations analysis. Showboat Star Partnership, 00-1227 at 11, 789 So.2d at 561 n. 10.
The instant case presents this court with the opportunity to directly address the differing interpretations accorded Article 466 by the jurisprudence and to dispositively resolve the conflict presented by the Equibank and Prytania Park decisions. After extensive review of the issue and the thoughtful arguments on both sides of the debate, we find that the proper approach to interpreting Article 466 is that reflected in the Prytania Park decision, and that to properly resolve the issue before this court, it is neither proper nor necessary to resort to a societal expectations analysis. The reasons that dictate this conclusion are as follows.
First, civilian methodology and the civil code instruct that the sources of law are legislation and custom, and that legislation is the superior source of law. LSA-C.C. arts. 1, 3. Legislation, which is defined as the solemn expression of legislative will, LSA-C.C. art. 2, is to be interpreted according to the rules set forth in the Civil Code. Chief among those rules is the admonition in LSA-C.C. art. 9 that "[w]hen a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature." Additionally, LSA-C.C. art. 11 instructs that "[t]he words of a law must be given their generally prevailing meaning."
Thus, we begin, as we must, with the words of the law. Dumas v. State, Department of Culture, Recreation & Tourism, XXXX-XXXX, p. 11 (La.10/15/02), 828 So.2d 530, 536. In this case, a plain reading of the text of Article 466 supports the conclusion that the two paragraphs of the article are not disjunctive, but interdependent. The article states:
Things permanently attached to a building or other construction, such as plumbing, heating, cooling, electrical or other installations, are its component parts.
Things are considered permanently attached if they cannot be removed without substantial damage to themselves or to the immovable to which they are attached.
A straightforward reading of the language, absent any judicial gloss based on jurisprudence interpreting the pre-revision law, supports the conclusion that the two paragraphs are interdependent, with the second paragraph defining how the items enumerated in the first paragraph must be attached. Indeed, it makes little sense, as Professor Symeonides suggests, to define the phrase "permanently attached" as having two different meanings ("temporal" and "physical") for purposes of the same code article. A disjunctive reading of the two paragraphs, such as Professors Symeonides and Yiannopoulos advocate, is appropriate only if one resorts to "historical" source material to effectively "re-write" the article. Indeed, in his law review article, Professor Symeonides acknowledges that to literally support his interpretation of the article, the second paragraph of Article 466 would have to be re-drafted to read as follows: "Things permanently attached to a building or other construction so that they cannot be removed without substantial damage to themselves or to the thing to which they are attached, are likewise its component parts." Symeonides, 46 La. L.Rev. at 689. Of course, Professor Symeonides argues that such a re-writing of the article is not necessary in light of Equibank, which he postulates to have corrected the legislature's *1086 "poor choice of words" in drafting the article.
Although hesitant to disagree with two eminent scholars, we are constrained to follow the unambiguous words of the code article. Additionally, we find the problem with the approach of Professors Yiannopoulos and Symeonides is that it assumes that Article 466, when adopted as part of the revision of the code articles on property law, did not change the law and that pre-revision jurisprudence continues to be relevant in interpreting the article. There are two important legislative sources that severely undermine this assumption.
First, and foremost, the only positive law to address the issue, the enabling legislation that created the revised articles found in Title 1 of Book II of the Civil Code, Act 728 of 1978, expressly declares at Section 1: "Title 1 of Book II of the Louisiana Civil Code of 1870, containing Articles 448 through 487, relative to things, is hereby revised, amended, and reenacted, substituting therefor new Articles 448 through 476." 1978 La. Acts No. 728, § 1, at 1900 (emphasis added). Section 3 of the Act further provides that "[a]ll other laws or parts of laws in conflict with this Act are repealed." 1978 La. Acts No. 728, § 3, at 1943. This language indicates that former Articles 467, 468, and 469 fall into the category of articles that have not been expressly repealed, but are subject to implicit repeal to the extent to which their content is irreconcilable with that of the new article. Lovett, 48 Loy.L.Rev. at 667-668.
The Official Revision Comments to Article 466 reveal the extent to which the content of former Articles 467, 468 and 469 is irreconcilable with that of the new article. The pertinent portions of those comments provide:
(a) The text of this provision is new. It is based in part on Article 469 of the Louisiana Civil Code of 1870. It changes the law.
....
(d) According to Article 467 of the Louisiana Civil Code of 1870, things that the owner of a building "has attached to or actually connected with" the building "for the use or convenience" of the building are "immovables by nature." This provision has been suppressed. Unity of ownership of the building and of the movables is no longer required; moreover, the test of use or convenience of the building is abrogated. Immobilization takes place under Article 466 when movables are permanently attached to a building or other construction.
(e) According to Article 469 of the Louisiana Civil Code of 1870, "the owner is supposed to have attached to his tenement or building forever such movables as are affixed to the same with plaster, or mortar, or such as cannot be taken off without being broken or injured, or without breaking or injuring the part of the building to which they are attached". The substance of this provisions [sic] has been reproduced. Louisiana jurisprudence interpreting Article 469, therefore, continues to be relevant.
These Comments suggest that, contrary to the argument of Professors Symeonides and Yiannopoulos, Article 466 was intended to represent a break from the old law, and that its "historical" sources remain largely irrelevant. Indeed, Comment (d) advises that former Article 467, along with its test of use or convenience of the building, is suppressed. Comment (e) advises that the substance of Article 469, which created the presumption of attachment through the principle of substantial damage, has been reproduced and therefore jurisprudence interpreting that article continues *1087 to be relevant. Reading these two Comments together leads one to conclude that while former Article 469 and its jurisprudential gloss remain relevant, former Articles 467 and 468 have been repealed by implication and thus, their judicial interpretations are not relevant.
The significance of this conclusion becomes apparent when one remembers that it was the pre-revision interpretation of former Article 467 in Lafleur that gave birth to the societal expectations analysis. The Lafleur decision and its societal expectations language undeniably existed when the property law revisions were being drafted, but the analysis is not mentioned anywhere in the language of Article 466, in the Comments thereto, in the Expose des Motifs accompanying the revision, or in any other potentially relevant article in the code. It is not mentioned in the records of the Louisiana State Law Institute dealing with the drafting of Article 466.
Civilian methodology instructs that where the law does not lead to ambiguous or absurd results, it must be applied as written. LSA-C.C. art. 9. The plain text of Article 466 does not reference "societal expectations" in determining whether an item is a component part of a building. Rather, it employs a straightforward, practical, bright-line test: permanent attachment, as defined by the article. As Professor Lovett notes in his law review article:
[T]he Prytania Park interpretation of Article 466 offers one clear, easily applied, practically black letter rule that courts and litigants can employ with little need to use complex or highly technical expert testimony. By relying on a "terse and lapidary" rule, as opposed to a more flexible "standard," this approach tends to promote the classic civilian priority of certainty in the law and forces parties who desire to alter the Code's classification of movables as either component parts or as separate movables to do so in negotiation and in carefully drafted and perhaps more detailed agreements.
Lovett, 48 Loy. L.Rev. at 712. Advocates of the Equibank approach to Article 466 have argued that a strict application of the article would lead to absurd consequences because loosely attached but relatively inexpensive items that are often considered part of a private residence, such as doors, gutters, shutters and ceiling fans, could be considered separate movables.[15] In truth, the determination that such items are separate movables does not create an absurd result, but simply necessitates a more careful drafting of documents transferring or alienating the property.
Arguably, the chief impediment to adopting an interpretation of Article 466 consistent with Prytania Park is the body of intermediate state court jurisprudence that has developed in the wake of Equibank. Reliance on jurisprudence constante, however, is misplaced as will be noted infra. Furthermore, we are a civilian jurisdiction in which legislation, the solemn expression of the legislative will, is the superior source of law.[16] LSA-C.C. *1088 art. 2. Jurisprudence constante[17] carries "considerable persuasive authority," Doerr v. Mobil Oil Corp., 00-0947, p. 14 (La.12/19/00), 774 So.2d 119, 128, but is not the law.
We must be ever mindful that once this court has ruled on an issue we should be extremely reluctant to change our position, as both the legislature and society in general should be able to rely on the finality of our pronouncements. Stability and predictability in the law demand such a result. We cannot ignore the fact that it was a federal court, in Equibank, that introduced this interpretation of Article 466 to Louisiana. Significantly, prior to Equibank, Louisiana courts interpreting revised Article 466 generally ignored pre-revision decisions interpreting the former code articles (including Lafleur) and focused exclusively on the question of substantial damage. See, National Companies v. Bridgewater, 398 So.2d 29, 33 (La.App. 4 Cir.1981) (holding that a cotton press was a component part of immovable property because it would be substantially damaged upon removal); Simmons v. Board of Commissioners for Port of New Orleans, 442 So.2d 836, 839 (La.App. 4 Cir.1983) (holding that a fence containing a gate was not a component part of a wharf because it had been removed without substantial damage). It was only after Equibank that intermediate state appellate courts began to adopt the disjunctive interpretation of Article 466. With the exception of our ambivalent comments in Showboat Star Partnership, this court has never definitively spoken on the issue of the proper interpretation of LSA-C.C. art. 466; therefore, the only basis for applying jurisprudence constante would be intermediate state appellate courts adopting a decision of an intermediate federal court. This is a slender reed to support an argument in favor of jurisprudence constante in this case.[18]
The advantage of applying the Prytania Park approach over the Equibank analysis and its societal expectations test is illustrated when one turns to the facts of the present case. In this case, in resolving the issue of whether the nuclear cameras are component parts of Willis-Knighton's building, the court of appeal first determined "that the two paragraphs of Article 466 are separate and distinct and should be applied independently to determine whether a particular object is a component part." Willis-Knighton Medical Center, 37,914 at 9, 862 So.2d at 364. Finding that "nuclear cameras are neither enumerated in the first paragraph of Article 466 nor deemed to be permanently attached under the second paragraph," the court went on to apply the societal expectations test, presumably in an effort to determine whether such cameras could be included among the "other installations" referenced in the first paragraph of Article 466. Id., 37,914 at 10, 862 So.2d at 365.
As one attempts to apply this test, the elusive and nebulous nature of the societal expectations inquiry is revealed. In the district court, there was expert testimony to the effect that nuclear cameras are a necessary component of a hospital and that *1089 one would expect to see such cameras in any full service hospital. Pursuant to this testimony, the district court concluded that "ordinary societal expectation would include nuclear cameras." The court of appeal reversed this determination, holding that the district court erred in finding that society expects a hospital to contain nuclear cameras. The court of appeal held that the proper inquiry "is whether a commercial building must contain a nuclear camera to meet societal expectations. This obviously is not the case." Id., 37,914 at 11, 862 So.2d at 365. In effect, the court of appeal determined that under the societal expectations test, the use of a particular building is irrelevant; rather, the proper inquiry is whether the community views the item as permanently serving the immovable itself, and not the use to which it is being put.
The problems with the court of appeal's analysis are two-fold. First, in phrasing the societal expectations test in terms of whether the item permanently serves the immovable itself, the court of appeal, in effect, resurrects the requirement of former Article 467 that the item be attached to the building "for the use or convenience of the building," a requirement that the Revision Comments to Article 466 specially state "has been suppressed." See, Article 466, Revision Comments (d).
Second, the court of appeal's analysis raises evidentiary problems. In the district court, there was expert testimony as to what one would expect to find as a component part of a hospital. The court of appeal discounts this testimony entirely and instead substitutes its own subjective assumptions about what society expects and what notions prevail in society to conclude that society does not expect to find nuclear cameras in commercial buildings. Such a process does little to insure certainty in the application of the law.
Further uncertainty and lack of predictability are interjected when one attempts to apply the societal expectations test in different settings. For example, in the context of a residence, it might be relatively easy to establish what items society might expect to find as component parts. In a more complex setting, involving a commercial or industrial construction for example, the inquiry becomes more difficult. A question arises as to what segment of society is to be consulted for its expectations: the average man or woman on the street, or some more sophisticated party, such as a prospective purchaser of the property. With its near-rhetorical inquiry, the societal expectations test interjects too much open-endedness, flexibility, and discretion in an area of the law that demands certainty and predictability.[19] The societal expectations test, with no basis in legislation, requires excessive, unfettered judicial rule-making.
On the other hand, if the Prytania Park analysis is applied, the inquiry becomes very simple. First, we look to the first paragraph of Article 466 to determine if nuclear cameras are "plumbing, heating, cooling, electrical or other installations." Assuming that the cameras can broadly be classified either as "electrical or other installations," the next inquiry becomes whether they are permanently attached, i.e., whether "they cannot be removed without substantial damage to themselves *1090 or to the immovable to which they are attached," as specified in the second paragraph of the article.
In this case, Wesley Smith, Willis-Knighton's Director of Clinical Engineering, testified that the nuclear cameras are installed in a room, the floor of which has to be specially prepared due to the cameras' weight. The cameras are placed on epoxy foundations and bolted to the floor. They are hard-wired to the hospital's electrical system. Nevertheless, Mr. Smith testified that to remove the cameras, it is only necessary to remove the bolts and disconnect the wiring, necessitating some minor repair of the sheetrock and the replacement of floor tile. Under questioning, he conceded that removal of the cameras substantially damages neither the cameras nor the hospital building. Because the testimony in this case does establish that the cameras can be removed without substantial damage to themselves or to the hospital building, they cannot be considered component parts as a matter of law. This approach is clear, straightforward, limits judicial discretion, and produces certainty and predictability in the law, a result that is certainly desirable in an area such as property law.
Of course, the determination that the nuclear cameras are not component parts of Willis-Knighton's building because they are not permanently attached within the meaning of LSA-C.C. art. 466 does not necessarily end the inquiry. When the 1978 revisions to the Civil Code articles governing immovables were enacted, a substantive change was effected in that the former classification of immovables as either (1) immovables by nature, (2) immovables by destination, or (3) immovables by their object was eliminated. Immovables are now classified only as corporeal and incorporeal. Expose des Motifs, p. 10; Student Symposium, The Work of the Louisiana Legislature for the 1978 Regular Session, 39 La. L.Rev. 101, 166 (1978). With respect to corporeal immovables, the Civil Code now specifically defines component parts as things incorporated into a building so as to become an integral part of it (LSA-C.C. art. 465) and things permanently attached to a building (LSA-C.C. art. 466).[20] Hence, it is not sufficient merely to look to LSA-C.C. art. 466 to determine if the nuclear cameras are component parts of Willis-Knighton's building. We must also examine LSA-C.C. art. 465. That article directs that "[t]hings incorporated into a tract of land, a building, or other construction, so as to become an integral part of it, such as building materials, are its component parts."
Article 465 has not given rise to controversy and, in fact, has received little attention in the jurisprudence or in legal commentary. Its application has been viewed as largely fact-driven. See LSA-C.C. art. 465, Revision Comments (c) ("Incorporation is a question of fact to be determined by the trier of facts.") While the article does not specifically define what is meant by the term "incorporated,"[21] it does provide an example of the type of items-building materials-that may be incorporated into an immovable so as to become an "integral part" of it. Enumerated items are a guidepost for determining *1091 what non-enumerated items are to be included in the meaning of a phrase. See Cox Cable New Orleans, Inc. v. City of New Orleans, 624 So.2d 890, 894 (La.1993) citing Rollins Environmental Services of Louisiana, Inc. v. Iberville Parish Police Jury, 371 So.2d 1127 (La.1979) ("[T]he meaning of words or phrases may be ascertained by the words or phrases with which they are associated. Words of general meaning should be applied only to such classes of things of the same general kind as those specifically mentioned."). A general characteristic of building materials (the most common examples that come to mind are bricks, nails, sheet rock, and roofing tiles[22]) is that once placed in a building, they lose their identity as separate things and become merged in the building to the extent that they become a part of it. Consequently, it can be argued that the test for determining whether an item has become a component part of an immovable by incorporation is whether it has lost its identity as a movable and become a part of the immovable.
Indeed, this is the test suggested by paragraph (c) of the Comments to Article 465. ("[Incorporation] may be regarded as established when movables lose their identity or become an integral part of the immovable."). It is similar to the approach advocated in the Expose des Motifs:
In Article 465 (1978), things incorporated into a tract of land or a building, so as to become an integral part of it, are designated as its component parts. Incorporation may be regarded as established in cases in which movables lose their identity, removal of the things would result in damage to them or to the immovable, and in cases in which the things incorporated would be of little or no value after removal.
Further, this approach has been adopted by the pre-revision jurisprudence, which, as the Comments to Article 465 suggest, continues to be relevant. See Lighting Fixture Supply Co. v. Pacific Fire Ins. Co. of New York, 176 La. 499, 512-513, 146 So. 35, 39 (1932) (concurring opinion by O'Neil, C.J.), cited in Revision Comments (b).
In this case, it is doubtful that the nuclear cameras can be considered to fall within the same general class of items as building materials.[23] The testimony establishes that they do not lose their identity as separate things once attached to the hospital building, they can be removed without damage to themselves and without substantial damage to the hospital building, and they can be re-sold once removed.[24] Given these facts, the cameras cannot be classified as component parts under Article 465.
In the final analysis, we agree with and affirm the court of appeal's determination that Willis-Knighton's nuclear cameras are not component parts of its hospital buildings and thus are not immovables within the contemplation of the Civil Code articles governing immovable property. However, *1092 we reject the societal expectations test as a means of determining component parts of immovables under Article 466 and also reject a disjunctive reading of the two paragraphs of Article 466 as creating two independent types of component parts. In Louisiana, legislation is superior to any other source of law. LSA-C.C. art. 2. We apply legislative provisions as written because this court cannot and should not ignore the plain expression of legislative will evidenced in the clear and unambiguous words of LSA-C.C. art. 466. As part of the 1978 revisions of the Civil Code articles concerning immovables, Article 466 now requires only that a component part of a building be "permanently attached," and for the first time specifically defines that which is "permanently attached."

II. EXEMPTION OF MEDICAL DEVICES FROM LOCAL TAXATION
LSA-R.S. 47:305 sets forth various exemptions from the sales and use taxes imposed by the state in Chapter 2 of Subtitle II of Title 47 of the Louisiana Revised Statutes. Among the exemptions is one for "medical devices," found in LSA-R.S. 47:305(D)(1)(s), which, during the time period relevant to this litigation,[25] provided in pertinent part:
(1) The sale at retail, the use, the consumption, the distribution, and the storage to be used or consumed in this state of the following tangible personal property is hereby specifically exempted from the taxes imposed by this Chapter:
....
(s) Any and all medical devices used exclusively by the patient in the medical treatment of various diseases or administered exclusively to the patient by a physician, nurse, or other health care professional or health care facility in the medical treatment of various diseases under the supervision of and prescribed by a licensed physician.
The issue this court is called upon to resolve is whether the exemption from state sales and use taxes for medical devices, set forth above, applies to sales and use taxes imposed by local taxing authorities, including the present defendant. The district court ruled, and Willis-Knighton contends, that medical devices were exempt from local sales and use taxes under LSA-R.S. 47:305(D)(6), as the statute existed in 1985, and that a 1991 amendment to Subsection 6 did not alter the exemption. The court of appeal ruled to the contrary, concluding that the "plain effect" of 1991 La. Acts, No. 1065, § 1, amending Subsection D(6), was to remove any exemption from local sales and use taxes unless there was a clear indication that the exemption applied to local taxes, and that because Subsection D(1)(s) contains no such indication, the medical device exemption does not apply to local taxing authorities. After review of the relevant statutory provisions and consideration of the arguments of the parties, we agree with the court of appeal's conclusion and affirm that court's determination that local taxing authorities, including the present defendant, are not precluded from levying sales and use taxes on the sale of medical devices.

A. Applicability of enumerated exemptions.
The applicability of the various exemptions enumerated in LSA-R.S. 47:305 to sales and use taxes levied by local taxing authorities is addressed in Subsection D(6) of the statute. At the time the medical device exemption was enacted by 1985 La. *1093 Acts, No. 901, Subsection D(6) (formerly Section 305(4)(f)) provided:
The exemptions from the state sales and use tax provided in this Subsection shall be applicable to any sales and use tax levied by any local governmental subdivision or school board except as otherwise provided in this Subsection.
The medical device exemption was not among those exemptions specified in LSA-R.S. 47:305(D)(4) as not applying to local taxing authorities;[26] therefore, by virtue of Subsection D(6), the exemption from state sales and uses taxes of sales of medical devices was arguably extended to local taxing authorities. See BP Oil Company v. Plaquemines Parish Government, 93-1109, p. 14 (La.9/6/94), 651 So.2d 1322, 1331, wherein we noted (in connection with a different exemption) that Section 305(D)(6)'s provisions prior to a 1991 amendment extended exemptions to sales and use taxes levied by local governmental authorities which extension clearly incorporated all of the exemptions listed in Section 305(D)(1), which, in this case, includes the exemption of sales of medical devices.
However, Section D(6) was amended by 1991 La. Acts, No. 1065 to provide:
The exemptions from the state sales and use tax provided in this Subsection in existence as of the effective date of Act 205 of 1978 shall be applicable to any sales and use tax levied by any local governmental subdivision or school board except as otherwise specifically provided in this Subsection. Without determining the validity of any exemptions placed in this Subsection subsequent to the effective date of Act 205 of 1978, all Acts after the 1991 Regular Session placing an exemption in this Subsection which is applicable to a political subdivision must, to be effective, specifically provide in the title and body of the bill that it is applicable to a political subdivision. The exemptions provided in R.S. 47:305(D)(1)(t) are hereby deemed to specifically comply with Act 205 of 1978.
The medical device exemption was placed in Section 305(D) by Act 901 of 1985 and became effective commencing on September 1, 1985. Thus, the exemption neither existed as of the effective date of Act 205 of 1978, nor was it placed in the Subsection after the 1991 regular session. The precise issue we are called upon to address is whether the medical device exemption applies to local sales and use taxes paid under protest commencing in January 1998, subsequent to the effective date of the 1991 amendment.
Willis-Knighton contends, and the district court ruled, that the 1991 amendment to Section 305(D)(6) affects only exemptions created after 1991. Willis-Knighton reasons that because the amendment is silent as to exemptions, such as the medical *1094 device exemption, enacted after 1978 but prior to 1991, the applicability of the exemption to local taxing authorities must be determined by the law in effect at the time the exemption was created. Because the law in effect in 1985, when the medical device exemption was enacted, extended the exemption to local taxing authorities, Willis-Knighton argues that the legislature intended that the medical device exemption apply at the local level.

B. Statutory construction principles.
At first glance the legislature appears to skirt the issue of the applicability of the medical device exemption to local sales and use taxes imposed after 1991 by the statement "[w]ithout determining the validity of any exemptions placed in this Subsection subsequent to the effective date of Act 205 of 1978." LSA-R.S. 47:305(D)(6). However, basic and well-settled principles of statutory construction guide us in resolving the issue presented here. The first and foremost of such principles is that tax exemptions, being an exceptional privilege, must be expressly and clearly conferred in plain terms. McNamara v. Central Marine Service, Inc., 507 So.2d 207, 208 (La.1987); Showboat Star Partnership, 00-1227 at p. 10, 789 So.2d at 560. Exemption provisions are strictly construed against the taxpayer claiming the benefit of an exemption and must be unequivocally and affirmatively established by the taxpayer. Id.; Archer Daniels Midland Company v. Parish School Board of the Parish of St. Charles, 01-0511, p. 11 (La.11/28/01), 802 So.2d 1270, 1278.
An examination of LSA-R.S. 47:305 during the relevant time period reveals that the statute contains no language that would clearly and expressly extend the medical device exemption to local taxing authorities. For example, Section 305(D)(1) instructs that "[t]he sale at retail, the use, the consumption, the distribution, and the storage to be used or consumed in this state of the following tangible personal property is hereby specifically exempted from the tax imposed by this Chapter." (Emphasis supplied). The only tax imposed in this Chapter is the state sales and use tax. By the express language of Section 305(D)(1), therefore, the exemptions listed thereafter (including the medical device exemption) only apply to state sales and use taxes, unless there is another provision of law specifically providing otherwise. No such provision exists. Section 305(D)(6) is silent as to the applicability to local taxing authorities of exemptions, such as the medical device exemption, placed in the statute between the effective date of Act 205 of 1978 and the 1991 Regular Session. Absent a clear, unequivocal and affirmative expression that the exemption applies at the local level, it cannot be interpreted to extend to local taxing authorities. See McNamara, supra; Showboat Star Partnership, supra.
A second and equally well-settled principle of statutory construction that guides our determination in this instance is the rule set forth in LSA-C.C. art. 13, that laws on the same subject matter must be interpreted in reference to each other. As the court of appeal recognized in this case, two other statutes in effect at the time the medical device exemption was created directly address the applicability of the state sales and use tax exemption to local governing authorities. Act 205 of 1978 amended and reenacted LSA-R.S. 33:2716.1 and amended LSA-R.S. 47:302. The amended provisions of LSA-R.S. 33:2716.1[27] state in pertinent part:
(B) No exemption from the state sales and use tax granted subsequent to the effective date of this Act and granted *1095 pursuant to the provisions of Chapters 2 or 2-A of Title 47 of the Louisiana Revised Statutes of 1950 shall be applicable to any sales and use tax levied by any local governmental subdivision or school board unless the state exemption specifically provides that it applies to such sales and use tax levies. In the absence of any such specific application of the state exemption to sales and use tax levies of any local governmental subdivision or school board, any state exemption granted after the effective date of this Act and granted pursuant to the provisions of Chapters 2 or 2-A to Title 47 of the Louisiana Revised Statutes of 1950 shall be applicable only to the levy and collection of the state sales and use tax.
In addition, the amended LSA-R.S. 47:302(E) provides:
No exemption from the state sales and use tax granted after the effective date of this Act and granted pursuant to the provisions of this Chapter or Chapter 2-A of Title 47 of the Louisiana Revised Statutes of 1950 shall be applicable to any sales and use tax levied by any local governmental subdivision or school board unless the state exemption specifically provides that it applies to such sales and use tax levies. In the absence of any such specific application of the state exemption to sales and use tax levies of any local governmental subdivision or school board, any state exemption granted pursuant to the provisions of this Chapter or Chapter 2-A of Title 47 of the Louisiana Revised Statutes of 1950 shall be applicable only to the levy and collection of the state sales and use tax.
These statutes, in effect when the medical device exemption was created by Act 901 of 1985, clearly state that an exemption from state sales and use tax will not apply to local sales and use tax levies unless the statute creating the state exemption specifically provides that it is to apply to local taxing authorities. Construing these provisions in pari materia with LSA-R. S. 47:305(D)(6) in its post-1991 amendment form makes it clear that the exemption from state sales and use taxes for sales of medical devices contained in Section 305(D)(1)(s) does not extend to local taxing authorities. There is simply no language in the statute, as required by LSA-R.S. 33:2716.1 and LSA-R.S. 47:302(E), that specifically extends the exemption to local taxing authorities.
If anything, the effect of the 1991 amendment to Section 305(D)(6) was to correct the inconsistency that previously existed between the language in that Section and in LSA-R.S. 33:3716.1 and LSA-R.S. 47:302(E). Prior to the 1991 amendment, Section 305(D)(6) created a presumptionthat the exemptions enumerated therein would apply to local taxing authorities unless otherwise specifically statedthat was the reverse of the presumption created in LSA-R.S. 33:3716.1 and LSA-R.S. 47:302(E). The inconsistency in the language of the statutes was removed by the 1991 amendment to Section 305(D)(6), the plain effect of which, as the court of appeal correctly recognized, was to remove any exemption from local sales and use taxes unless the statute clearly states that it applies to local taxes. Subsection 305(D)(1)(s), the medical device exemption, contains no such clear statement.[28]
*1096 Willis-Knighton contends that BP Oil Company v. Plaquemines Parish Government, supra, mandates a different conclusion. It argues that our decision in that case dictates a finding that the medical device exemption applies to local taxing authorities. Two appellate courts to consider the issue, the first circuit in Tenet Healthsystems Hospitals, Inc. v. Parish of St. Tammany, 99-0924 (La.App. 1 Cir. 6/23/00), 762 So.2d 1144, writ denied, 00-2518 (La.11/27/00), 775 So.2d 448, and the second circuit in the instant case, have rejected that contention, finding the precise holding in BP Oil Company distinguishable. We agree with that assessment. The BP Oil Company taxpayers sought refunds of local sales and use tax payments made for the period between January 1985 through October 1990. In addressing the applicability of the exemption from sales and use taxes of the petroleum refinery by-product coke-on-catalyst under LSA-R.S. 47:305(D)(1)(h), this court examined the language of LSA-R.S. 47:305(D)(6) as it existed during the time period that the taxpayers sought refunds, from 1985-1990. However, the precise language relied upon by this court was removed from the statute by the amendment effected by 1991 La. Acts, No. 1065, § 1. The instant case is the first occasion this court has had to consider the amended language of LSA-R.S. 47:305(D)(6).
We find, as did the appellate courts in Tenet Healthsystems Hospitals, Inc. and in the decision below, that a plain reading of LSA-R.S. 47:305(D)(1)(s) and 305(D)(6) compels the conclusion that the effect of the 1991 amendment to Section 305(D)(6) was to remove any exemption from local sales and use tax unless there is a clear statement that the exemption is to apply to local taxing authorities. Section 305(D)(1)(s) contains no such statement; therefore, the medical device exemption does not apply to sales and use taxes levied by a local taxing authority. Because we find that a plain reading of LSA-R.S. 47:305 mandates the conclusion we reach herein, we do not find it necessary, as Willis-Knighton urges, to delve into the legislative history of the exemption to ascertain the legislative intent, that intent being made manifest in the words of the statute.[29] LSA-R.S. 1:4; LSA-C.C. art. 9; Cacamo v. Liberty Mutual Fire Insurance Co., 99-3479, 99-3480, 99-3481, p. 7 (La.6/30/00), 764 So.2d 41, 45.
*1097 Finally, and in the alternative, Willis-Knighton asserts that if the legislature did not in fact extend the medical device exemption to local taxing authorities, then the provisions of LSA-R.S. 47:305(D)(1)(s) are unconstitutional under La. Const. art. VI, § 29(D), which prohibits the legislature from enacting an exemption that does not uniformly apply to levies of sales and use taxes by the state and its political subdivisions. The issue of the constitutionality of LSA-R.S. 47:305(D)(1)(s) was first raised by Willis-Knighton by virtue of a "Second Motion for Partial Summary Judgment" filed in the district court, a copy of which was served on the Attorney General. However, the scheduled hearing on the motion was continued on motion of the defendant Commission on the representation that, among other grounds, consideration of the constitutional issue was premature until such time as the district court ruled on whether the medical device exemption was applicable to local taxing authorities. The case proceeded to trial and the district court, in fact, determined that the medical device exemption extended to both the state and its political subdivisions. Therefore, the constitutional issue was never ruled on by the district court. It was not addressed by the court of appeal.
Although we find that the constitutional issue was properly raised, this court is not the proper forum in which to address the issue in the first instance. See Vallo v. Gayle Oil Company, Inc., 94-1238, p. 9 (La.11/30/94), 646 So.2d 859, 865-866. Because the constitutional issue was apparently pretermitted, the appropriate procedure is to remand the case to the trial court for consideration of the constitutionality of LSA-R.S. 47:305(D)(1)(s) in light of La. Const. art. VI, § 29(D). See Palacios v. Louisiana and Delta Railroad Inc., 98-2932, p. 13 (La.7/2/99), 740 So.2d 95, 102. We will remand the case accordingly.

CONCLUSION
For the reasons expressed herein, we affirm the decision of the second circuit court of appeal. However, we remand this matter to the district court for consideration of the constitutionality of LSA-R.S. 47:305(D)(1)(s).
AFFIRMED; CASE REMANDED TO DISTRICT COURT.
KIMBALL, J., concurs in part and dissents in part.
I concur in the majority's conclusion with respect to the exemption of medical devices from local taxation and in its decision to remand the matter to the district court for it to consider the constitutionality of La. R.S. 47:305(D)(1)(s). I dissent, however, from the majority's conclusion that the nuclear cameras are not component parts of Willis-Knighton's hospital buildings. I also specifically disagree with the majority's decision to reject the societal expectations test and to disapprove a disjunctive reading of the two paragraphs of La. C.C. art. 466.
The majority determines that the meaning of Article 466 is plain, clear and unambiguous, yet the courts have been struggling with the meaning and proper interpretation of this article for more than twenty years. Contrary to the majority's conclusion, I believe that a plain reading of the article raises questions of whether each paragraph in the article stands alone and establishes an alternative method for analyzing whether something is a component part, or whether the paragraphs are interdependent. In my view, it is at least plausible to interpret Article 466 as establishing as a matter of law that a building's attachments that can be classified as "plumbing, heating, cooling, electrical or other installations" are considered permanently attached and therefore component parts regardless of whether *1098 they can be removed without substantial damage to themselves or to the immovable to which they are attached. The majority, however, essentially ignores the enumerated list of things found in the first paragraph in favor of analyzing only whether things, be they listed in the first paragraph or not, can be removed without the substantial damage specified in the second paragraph of the article.[1]
As an example, consider the following rather simplistic hypothetical, which is written in the style of La. C.C. art. 466:
Animals, such as cows, fish, pigs, and ducks, are sources of edible protein.
Things are considered animals if they are mammals.
Are fish and ducks sources of edible protein? Clearly they are, even though they are not mammals. The second paragraph is more narrow in its application, but it does not consume the substance of the first paragraph. The first paragraph is more broadly encompassing, but is no less valid than the second. This hypothetical shows the fallacy of the majority's construction of the article. Additionally, it illustrates problems inherent in the majority's interpretation, which will be discussed more fully below.
Because the law provided in the article is not clear and unambiguous, a resort to the historical record is proper. I have examined the documents currently held by the Louisiana State Law Institute relating to the revision of La. C.C. art. 466 and have found them to be inconclusive as to the proper interpretation of the article. It is simply unclear from the Minutes of the Council of the Louisiana State Law Institute and from various draft revisions, proposals and notes held by the Institute whether the separate paragraphs contained within the article were intended to be independent or interdependent. While the provisions that currently comprise La. C.C. art. 466 were initially set forth in separate articles in revision drafts, these drafts were ultimately rejected and the current form of Article 466 was adopted by the Council and, subsequently, by the legislature. It is not clear, however, whether the change was intended to make the provisions interdependent. While some argue the combination of the separate draft articles into one article indicates the paragraphs should not be read separately, it is at least equally reasonable to conclude the combination of provisions was an attempt to efficiently group similar subject matter into one article rather than a deliberate plan to alter the previous substance of the revision drafts. See generally Symeon Symeonides, Developments in the Law, 1984-1985: Property, 46 La. L.Rev. 655, 687 (1986) ("It seems that the two paragraphs were placed together under a single article as a result of historical accident rather than deliberate planning.").
In any case, even assuming an interdependent construction of the paragraphs is fitting, I believe such an application of the law leads to absurd consequences. Under the majority's interpretation, items like shutters, doors, hot water heaters, light fixtures, and ceiling fans, which are ordinarily considered part of a commercial building or residence, could be classified as separate movables. In my opinion, these items might all conceivably be included in the enumerated list of the first paragraph of Article 466. While doors and shutters present a closer question than the other items, I believe they could be classified as "other installations" because they are the same type of item as those enumerated in *1099 the list and are generally expected to be found in buildings. Consequently, these items could be classified as component parts under the first paragraph of Article 466. It appears, however, that all these items could be removed without substantial damage to themselves or to the immovable to which they are attached. Thus, if the paragraphs are interpreted independently of each other, the listed items would be considered component parts, but if the majority interpretation is used, the items would be classified as separate movables.[2] In my view, the majority's interpretation leads to absurd results in light of the fact that items such as these, which are ordinarily expected to be part of a building, could be classified as component parts under a reasonable interpretation, but this possibility is ignored in favor of a narrow construction of the article. Additionally, classifications under the majority's interpretation will undoubtedly result in far-reaching and unintended consequences when our other laws, such as those related to taxes and insurance, are applied in tandem.
For example, a residential purchaser would likely expect the front door to be included in his purchase of a house. Under the majority's analysis, the door, having not lost its separate identity as a door, would not necessarily be automatically included in the sale of the house. Additionally, the same purchaser would doubtless expect hot water generated by a water heater in his house and a toilet in his bathroom, but, again, these items would not necessarily be automatically transferred in the sale under the majority's interpretation of La. C.C. art. 466. It appears similarly absurd to contemplate the sale of a movie theater without transferring ownership of the seats or the movie screens. As the instant case shows, classifying these items as movables also has important tax consequences.
These absurd consequences are avoided by interpreting the paragraphs as separate provisions and applying the adaptable and commonsense societal expectations test. As explained by the majority, the societal expectations test was first utilized by then-Judge Tate in Lafleur v. Foret, 213 So.2d 141 (La.App. 3 Cir.1968), a pre-revision case. In that case, then-Judge Tate applied a flexible, workable analysis and explained that different factual situations might warrant additional considerations. Id. at 148. The societal expectations test flowed out of a struggle to determine whether air conditioning units, which were not specifically enumerated in the list of items contained in former La. C.C. art. 467, were nevertheless included within the ambit of the article. The inquiry was a natural and sensible solution to the interpretation dilemma.
There is no indication in the revision history of art. 466 that the societal expectations test should not be used to counter the absurd results produced by the majority's interpretation of the article. Contrary to the majority's suggestion that the societal expectations analysis is not mentioned in the revision materials, the Exposé des Motifs accompanying the revisions at issue indicates that the division of things into categories of immovable and movable is "ordinarily drawn in accordance with prevailing ideas in society...." While the majority attempts to use the absence of its *1100 mention to support its conclusion that the societal expectations test should be rejected, it is at least equally reasonable to interpret the silence on the issue as a tacit acceptance of the inquiry. In light of the absurd results produced by an interdependent construction of the article's paragraphs, I believe utilization of the societal expectations test is proper.
In the instant case, the nuclear cameras at issue are not clearly identified as one of the installations enumerated in the first paragraph of art. 466. To determine whether they should be included as a component part under this paragraph, I believe resort to the societal expectations test is appropriate. While the court of appeal properly turned to this test to resolve the instant dispute, it erred in asking whether society expects a commercial building to contain a nuclear camera, rather than whether society expects a hospital to contain a nuclear camera. In so doing, I believe the court of appeal misconstrued this court's opinion in Showboat Star Partnership v. Slaughter, 00-1227 (La.4/3/01), 789 So.2d 554.
At issue in Showboat Star Partnership was the purchase of gaming equipment for installation during construction of a riverboat gaming vessel and an exemption from sales tax for "sales of materials, equipment, and machinery which enter into and become component parts of ships, vessels, or barges." Plaintiffs argued that society would expect to find gaming equipment on a gaming riverboat. This court, however, disagreed with this argument, stating:
The pertinent sales tax exemption was designed to protect the shipyard industry, not the gaming industry. When the analysis is properly focused on the shipyard industry, the relevant inquiry is not whether society expects to see gaming equipment when it enters a riverboat operated for gaming purposes, but whether society expects to see such equipment when it enters a vessel. Significantly, the shipyard construction contract involving the vessel at issue did not mention gaming equipment. Moreover, gaming equipment is customarily moved around the vessel to keep customer interest. Finally, under the customs and practices of the shipyard industry developed in this record, shipbuilding contracts do not include such equipment. We therefore conclude that the average prudent business entity buying a vessel would not expect, in the absence of specific contractual provisions to the contrary, gaming equipment to be permanently attached to the vessel when the buyer took possession.
Id. at pp. 8-9, 789 So.2d at 559-60 (footnotes omitted). Because the tax exemption at issue in that case was intended to protect the shipyard industry rather than the gaming industry, this court's analysis properly focused on the shipyard industry as a whole. In the instant case, however, the tax at issue is applied to repairs of tangible personal property. Because a component part of an immovable is not considered tangible personal property, we must determine whether a hospital's nuclear cameras are tangible personal property or a component part of the hospital building. We are not dealing with an exemption from sales tax. Consequently, in my view, the proper question in this particular case is whether society expects a hospital building to house a nuclear camera. The record indicates that it does, and I would therefore find that the nuclear cameras are component parts not subject to the tax at issue.
Additionally, as alluded to above, the majority purports to read both paragraphs of Article 466 together, yet it effectively renders the first paragraph of the article meaningless. Although acknowledging that the first paragraph requires an analysis of whether the nuclear cameras are *1101 "plumbing, heating, cooling, electrical or other installations," the majority simply assumes that the cameras can be "broadly classified" as either electrical or other installations. By not employing a vigorous analysis to determine if, in fact, the test provided by the first paragraph has been satisfied, the majority reads out this provision in favor of applying only the test provided by the second paragraph.
Further, the majority criticizes the societal expectations test on the ground that it interjects uncertainty and lack of predictability into the law. It states, "With its near-rhetorical inquiry, the societal expectations test interjects too much open-endedness, flexibility, and discretion in an area of the law that demands certainty and predictability." Op. at 1089. The interpretation of art. 466 espoused by the majority, however, which focuses solely on the inquiry of whether "substantial damage" exists upon removal, leads to no more certainty and predictability in the law than the societal expectations test. Both tests are necessarily fact-driven and subject to a factfinder's discretion. The dissent on the issue of damage in this very case illustrates the point that the result of the analysis employed by the majority is no more certain and predictable than that supplied by the societal expectations test. In my view, the majority's criticism of the societal expectations test on this basis is unpersuasive.
Finally, the point of contention between the majority and the dissent regarding the existence of substantial damage resurrects the old and rejected classification of immovable by nature. The dissent also appears to adopt the temporal meaning of attachment that the majority purports to reject. In short, the majority's interpretation creates more problems than it solves.
Because the majority's interpretation of La. C.C. art. 466 leads to absurd consequences, I would read the two paragraphs as establishing independent tests and apply the societal expectations test to determine whether the nuclear cameras are component parts of the hospital building. Applying this test, I would conclude that the nuclear cameras are component parts of the hospital. Accordingly, I dissent from this portion of the majority's opinion and specifically disagree with its interpretation of La. C.C. art. 466.
JOHNSON, J. concurring in part and dissenting in part.
I concur in the majority's conclusion that the hospital's sales of medical devices are not exempt from local taxation under LSA-R.S. 47:305(D)(1)(s).
However, I must dissent from the majority's conclusion with reference to taxes on the repair and maintenance of the hospital's nuclear cameras. In my mind, the cameras are "permanently installed" and have become component parts of the hospital building.
VICTORY, J., additionally concurring.
In 1994, five years before the federal Fifth Circuit Court of Appeals decided Prytania Park in 1999, and while on the state Second Circuit Court of Appeal, I authored Hyman v. Ross and followed the 1985 federal Fifth Circuit opinion in Equibank discussing the "societal expectations" test.
After substantial research and study, I now believe the Prytania Park decision is correct in its analysis of Civil Code Article 466, and therefore, join the majority opinion. Nonetheless, for other reasons discussed in Hyman v. Ross, I maintain the result in that case was correct.
Further I concur in Justice Weimer's additional reasons assigned in the instant case.
*1102 TRAYLOR, Justice, concurs in part and dissents in part.
I agree with the majority's conclusion with respect to the exemption of medical devices from local taxation. I concur with the majority's analysis of La. C.C. art. 466, in holding that the two paragraphs which constitute that article must be read together. However, I dissent with the majority's application of this analysis to the facts presented to the court in this case.
I believe that the majority's interpretation of the "substantial damage" which must occur upon removal of a thing to be considered permanently attached is too narrow, encompassing only physical structural devastation to either the thing attached or to the building or other construction. The evidence in this case showed that the rooms in which the nuclear cameras at issue were placed had to be specially prepared in order to accommodate the weight of the cameras. In other words, there was no reason for this specially prepared room to exist in the building other than for the nuclear cameras which were installed. Thus, removal of the nuclear cameras, in my view, would cause "substantial damage" to the immovable to which they are attached because the part of the building constructed for the nuclear cameras would no longer have the use for which it was specifically constructed. The room at issue in this case would not exist but for the nuclear camera; nor, for that matter, would a bathroom exist without a commode.
This more common illustration illuminates this point. A commode is a part of the plumbing system of a bathroom in a building. In order to have a functioning plumbing system, the bathroom must be specially constructed with drains and pipes. However, a commode is not "permanently attached" to the plumbing system as interpreted by the majority. A commode may be easily removed from the floor without causing physical damage to the commode itself or to the floor on which it is installed. Removal of a commode, however, leaves only an open pipe in the floor, which does cause substantial damage to the building itself because there is no longer a functioning plumbing system.
Thus, I would find that the nuclear cameras at issue here were component parts of the hospital building. Consequently, the hospital should not be taxed for the repairs and maintenance on the nuclear cameras.
KNOLL, J., concurring in part.
I concur only in the result of the plurality opinion because I disagree with the plurality's rejection of Louisiana's long-standing societal expectations test as a means of determining component parts of immovables under La. Civ.Code art. 466.
In my view, the societal expectations test is not in conflict with La. Civ.Code art. 466. The genesis of the societal expectations test is found in a case authored by Judge Albert Tate, Lafleur v. Foret, 213 So.2d 141 (La.App. 3 Cir.1968). The proper standard to apply in cases where the parties have not specified their subjective intent on the matter "is a determination of whether the non-enumerated item, is, according to contemporary objective standards, a component of the immovable." Lafleur, 213 So.2d at 148 (emphasis added). This rationale was later adopted by Judge Politz in Equibank v. United States, 749 F.2d 1176 (5th Cir. 1985). A.N. Yiannopoulos, 2 LOUISIANA CIVIL LAW TREATISE-PROPERTY § 142.5, p. 331 (4th ed.2001). The concept of societal expectations analysis is part of Louisiana jurisprudence constante, and a most useful tool carefully applied by state and federal courts. Id. After the 1978 Revision of Book II, Title 1-Things, of the Louisiana Civil Code, our courts have generally reached sound results in interpreting *1103 La. Civ. Code art. 466, utilizing the societal expectation test.
Contrary to the plurality opinion's summary dismissal of this argument, this Court's adoption of the Prytania Park[1] approach to article 466 would lead to absurd consequences, in conflict with article 9 of the Civil Code. The change in the analysis the plurality pronounces today adds unnecessary complication in resolving issues heretofore soundly resolved without absurdity. The more commonsense approach embodied in the societal expectations analysis is, in my view, the more appropriate analysis. As the plurality opinion acknowledges, under its literal interpretation of article 466, loosely attached items normally considered part of a private residence, such as water heaters, doors, gutters, ceiling fans, chandeliers and loosely attached pieces of plumbing could be considered separate movables. The plurality opinion suggests this is not an absurd result, but only necessitates a more careful drafting of documents concerning the property. This makes the buying and selling of homes more complicated and it unnecessarily entails "legalistics" an unwary vendee and/or vendor would not anticipate, nor intended by this article. I find applying article 466 to classify such items the ordinary prudent person would expect to find in a residential building as separate movables is an absurd consequence and contrary to sound judicial interpretation of the Civil Code.
In sum, the plurality's literal interpretation of article 466 is historically and functionally incorrect. See Symeon Symeonides, Property, Developments in the Law, 1984-1985, 46 LA. L. REV. 655, 687 (1986). Accordingly, I concur only in the result reached by the plurality opinion. In my view, the nuclear cameras are part of the hospital's equipment and are not component parts of the building and thus, are not immovables.
WEIMER, J., assigns additional reasons.
In addition to the reasons assigned in the majority opinion, I write separately to address, and hopefully dispel, several concerns voiced in the concurring and dissenting opinions.
The primary objection to the majority's interpretation of LSA-C.C. art. 466 is the claim that a literal reading of the article's clear and unambiguous language produces "absurd" results because "items like shutters, doors, hot water heaters, light fixtures, and ceiling fans could be considered separate movables." With respect, this conclusion is founded on inverse reasoning. The analysis begins, not with the language of the article, but with a subjective assessment of what items should be component parts, and continues from that premise. Because "items like shutters, doors, hot water heaters, light fixtures, and ceiling fans" should be component parts, any interpretation of the article that would does classify such items as component parts, according to this reasoning, necessarily produces an absurd result.
The argument is premised on the assumption that "items like shutters, doors, hot water heaters, light fixtures, and ceiling fans" would be considered component parts if the two paragraphs of Article 466 are interpreted independently of each other. However, no explanation or analysis is afforded as to how items such as doors and shutters would be included in the enumerated list of Article 466's first paragraph as "plumbing, heating, cooling, electrical or other installations," and fall within the ambit of that paragraph's reach, regardless of the degree of attachment. In *1104 short, rather than illustrate the "absurdity" of a literal reading of Article 466, this argument demonstrates the fallacy of the inverse reasoning it employs. Instead of considering whether doors and shutters would be component parts under any reading of Article 466, the argument assumes that they are component parts and characterizes as "absurd" any interpretation of Article 466 which would find otherwise.[1]
The criticism leveled against the literal reading of Article 466 adopted by the majority is based on what is perceived to be the article's under-inclusiveness. However, the under-inclusiveness of the article does not make the legislature's policy choice in adopting it absurd. That the legislature chose to limit those items that might be considered component parts under Article 466 does not produce an absurdity. Although the legislature probably anticipated under-inclusiveness might cause harsh results, these provisions are suppletive. Any harshness in result can always be mitigated by private contractual agreement, and in the case of non-residential property, by application of Article 467 (immobilization by declaration).[2]
In adopting Article 466, the legislature evidently made a policy decision to change the law and to adopt a simple bright-line, fact-driven test for determining component parts that would produce more predictable and consistent results. There is no absurdity in the legislature's policy decision to define component parts differently.
Apparently, one concern that gives pause to those who oppose the majority's interpretation of Article 466 is the "far-reaching and unintended consequences" that could result from a literal interpretation of the article. Those concerns seem to focus particularly on the effect such an interpretation will have on the sale of residential property and the things that might or might not be included in the sale. For example, concern is expressed for the purchaser who might discover that the residence does not have doors, a hot water heater, or a toilet. The entire discussion in this regard is dicta as this case involves a sales tax issue, not the sale of a residence.
Resort to legislative history is unnecessary in this case, because the language of Article 466 is neither ambiguous nor does it lead to absurd results. Nevertheless, an examination of the legislative history of Article 466 reveals no reference whatsoever to the societal expectations test in conjunction with the drafting of the article. Although the legislative materials give no clear indication as to how the legislature intended the two paragraphs of the article to be interpreted, there is support for concluding that the revision of the prior law was intended to provide a simple, bright-line rule for determining component part *1105 status that would produce predictable and consistent results.
First, the original drafts of the revision articles followed the prior law and proposed the adoption of separate articles. Eventually, those articles were combined into one provision, and the language was altered, indicating that the provision should be treated as a single article, not as separate provisions.
Second, the Expose des Motifs that prefaces Title 1 of Book II of the Civil Code explains the relationship between former Article 467 and new Article 466. The Expose des Motifs notes that Article 467 (1870) "has given rise to many questions as its language has not been carefully chosen and the tests it established for immobilization are appropriate for immovables by destination rather than immovables by nature." Continuing, the Expose states:
New Article 466 (1978) declares that "Things permanently attached to a building or other construction, such as plumbing, heating, cooling, electrical or other installations, are its component parts." Unity of ownership of the building and of the movables is no longer required; moreover, the test of use or convenience of the building is abrogated. Immobilization takes place under Article 466 when movables are permanently attached to a building or other construction.
Expose des Motifs, 3 La. Civ.Code Ann. 3, 12. This comment suggests a rejection of the former civil code article and the adoption of a single unitary test for immobilization in Article 466, at odds with that in the former article and with the jurisprudence interpreting it.
Finally, a close reading undercuts the contention that the Expose supports the societal expectations test. Although "prevailing ideas in society" is alluded to in connection with a discussion of historical civilian approaches to the drafting of legislation that distinguishes between movables and immovables, that is followed in the next paragraph by the explanation that "[i]n contemporary civil law, the distinction rests, in principle, on physical notions of mobility and on `inherent' characteristics of things." Expose des Motifs, 3 La. Civ. Code Ann. at 9-10. This emphasis on physical characteristics and mobility undermines the concept of societal expectations as being integral to the classification of things as movables or immovables. Further, in the same paragraph, the Expose explains that policy goals may often require the law to classify certain objects, such as standing crops, animals, and farm implements, in precisely the opposite way they would be classified if "lay notions" prevailed, indicating the ways in which societal expectations can be unreliable as a source of legal classification. Id. See also, John A. Lovett, Another Great Debate?: The Ambiguous Relationship Between the Revised Civil Code and Pre-Revision Jurisprudence as seen through the Prytania Park Controversy, 48 Loy. L.Rev. 615, 670 (2002).
Another justification that is offered for interpreting Article 466 as creating two independent tests for immobilization is professed adherence to jurisprudence constante. However, this court candidly acknowledged in Showboat Star Partnership v. Slaughter, 00-1227 p. 7 (La.4/3/01), 789 So.2d 554, 558, that "[t]he judicial interpretations of Article 466 have not been consistent," the courts only generally resorting to a societal expectations analysis. Such acknowledged inconsistency in judicial interpretation is hardly the foundation for application of jurisprudence constante.
Moreover, as a civilian jurisdiction that has repeatedly rejected the importation of the common law doctrine of stare decisis, we should be reluctant to embrace the idea that because intermediate courts have arguably accepted an interpretation of Article *1106 466 that is at odds with its unambiguous language, we are bound to follow that interpretation.[3]Jurisprudence constante, as this court recognized in Doerr, is only "persuasive authority." Doerr v. Mobil Oil Corp., 00-0947, p. 14 (La.3/19/00), 774 So.2d 119, 128. The judiciary in Louisiana does not make law, but rather interprets the law. Jurisprudence must supplement, not supplant the legislation. Courts are thus free to correct prior erroneous interpretations of the law, subject to the caveat that this court should be extremely reluctant to depart from a prior decision.
The criticism that the majority interpretation of Article 466 effectively renders the first paragraph of the article meaningless is unfounded. That criticism is based on the incorrect premise that there are two tests for component part status under Article 466. The premise of the majority opinion is that Article 466 adopts only one test for determining component part status: permanent attachment. Permanent attachment is the test set forth in the first paragraph of the article. The second paragraph does not add this requirement; it simply defines the term. While the first paragraph of the article contains an illustrative list of items that can be permanently attached, those items must satisfy the test of permanent attachment to be component parts under Article 466.
In the final analysis, the position adopted by the majority does no more than adopt and adhere to an analysis of the code article that has been so oft-repeated by this court as to become the mantra for the interpretation of civil law statutes: "[t]he starting point for the interpretation of any statute is the language of the statute itself." Dumas v. State, Dept. of Culture, Recreation & Tourism, XXXX-XXXX, p. 11 (La.10/15/02), 828 So.2d 530, 536. Adherence to the plain language of the article is also consistent with the very purpose of a code, which is to provide a comprehensive statement of the law that is hopefully comprehensible to the lay person without requiring a search of "historical" and jurisprudential gloss in order to determine what the law is.
With respect to the issue of whether the codal analysis was properly applied to the facts of this case to find that the nuclear cameras are not component parts, it is clear that under the provisions of Article 466, the damage that results from removal of the thing must be "substantial." What is substantial damage will inevitably vary according to the facts and circumstances of each individual case.
*1107 In this case, the testimony establishes that removal of the nuclear cameras does not damage the cameras. Neither does it cause "substantial damage" to the immovable to which it is attached, i.e., the building. According to the testimony, in order to remove the cameras from the hospital, all that is required is that they be disassembled, unbolted from the floor, and disconnected from the power source. The floor must be repaired, and there must be some patching of sheetrock, but that is the extent of the damage. In order to alter the floor, the steel bolts that anchor the cameras would have to be cut out and then grouted over. The room would not have to be substantially damaged to remove the cameras. In the context of the hospital complex itself, and not just one room in the complex, such modifications are negligible, and can be considered as no more than a form of ordinary and entirely expected maintenance.[4] There is absolutely no evidence to suggest that the hospital will sustain any enduring damage in the sense that it will become functionally impaired on a permanent basis if the cameras are removed.
Because the evidence establishes that the rooms were not specially constructed to house the cameras, but were modified to accommodate them, and there is no indication that those rooms cannot be repaired and restored and used to house different and even more modern equipment, the test of "substantial damage" in Article 466 simply is not met as a matter of fact, and the cameras cannot be considered to be permanently attached component parts of the hospital. To conclude that the room is damaged because an item is removed goes too far under the facts of this case. There was no evidence these rooms could not serve other purposes.
In conclusion, regarding the component part issue, I note that a majority of the Justices agree with the result. A different majority agree with the analysis which rejects the societal expectation test and the parceling of Article 466 into two separate provisions in favor of a permanent attachment analysis with Article 466 serving as a single provision comprised of interrelated sentences.

ON REHEARING
PER CURIAM.
We granted rehearing in this matter for the sole purpose of considering the retroactivity of our decision insofar as it discusses the proper interpretation of LSA-C.C. art. 466, and its definition of a component part of an immovable.
In Lovell v. Lovell, 378 So.2d 418 (La.1979), this court set forth the following criteria for determining whether a judicial decision should be accorded prospective effect only:
(1) the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed; (2) the merits and demerits must be weighed in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective application will further or retard its operation; and (3) the inequity imposed by retroactive application must be weighed.
Lovell, 378 So.2d at 421-22.
Weighing these factors, we conclude that our opinion in this matter should be given prospective effect only. While that opinion does not change the *1108 substantive law but rather simply applies the law as it has existed since the 1978 Civil Code Revisions, we note that Louisiana appellate courts have employed a disjunctive reading of LSA-C.C. art. 466, and in doing so, have drawn on the societal expectations test as a measure for determining what items might be considered component parts under the first paragraph of Article 466. Because the courts, and no doubt individuals, have relied on this approach, and there was no clear indication (other than the decision of the federal court in Prytania Park Hotel, Ltd. v. General Star Indemnity Co., 179 F.3d 169 (5th Cir.1999)), that foreshadowed its demise, we find that this case is one which is appropriate for prospective application. We are bolstered in our conclusion in this regard by the fact that the area of law with which we are concernedthat of property lawis one in which predictability and stability are especially important. Retroactive application of our decision would undermine that important policy objective and potentially invite litigation, resulting in needless expense and inconvenience to numerous parties whose consummated transactions might be open to scrutiny under our opinion.
Therefore, in this matter before us, we adhere to our original opinion eschewing a disjunctive reading of the two paragraphs of Article 466 and use of the societal expectations test as a method of determining what is a component part within the meaning of the first paragraph of that article. However, we declare that that portion of the decision shall not be retroactive, but shall be given prospective effect only.
WEIMER, J., assigns additional reasons.
KNOLL and KIMBALL, JJ., additionally concur, and assign reasons.
VICTORY and JOHNSON, JJ., deny.
WEIMER, J., additional reasons.
I voted to grant a rehearing as to the issues related to LSA-C.C. art. 466 for the sole purpose of making the interpretation of that statute apply prospectively only. As outlined in the opinion, our role is to apply the law as written by the legislature. I remain convinced that LSA-C.C. art. 466, as written, is clear and unambiguous and its application in this case does not led to absurd consequences. As such, the article should be applied as written. Absent a so-called "societal expectation test" contained within the language of the statute, the judiciary should not super impose such.
Nevertheless, one must note the legislative response which was swift and overwhelming. See Senate Bill No. 196 of 2005 which amended LSA-C.C. art. 466 to divide the article into three disjunctive paragraphs.[1]
*1109 Concepts of separation of powers prohibit the legislature from "overruling" a judicial opinion. Obviously, the legislature can change the law by amending statutory provisions if the legislature decides that the language of a statute did not convey the actual intent of the legislature or if the legislature disagrees with a judicial interpretation.
Further, it is appropriate to reiterate our statements in Unwired Telcom Corp. v. Parish of Calcasieu, 03-0732 (La.1/19/05), 903 So.2d 392, 405 (on reh'g), in which we stated:
[T]he principle of separation of powers leaves no room for the adjudication of cases by the legislature.... [Quoting St. Paul Fire & Marine Ins. Co. v. Smith, 609 So.2d 809, 819 (La. 1992).]
[I]t is not within the province of the legislature to interpret legislation after the judiciary has already done so. Under our system of government, "[i]t is emphatically the province and duty of the judicial department to say what the law is." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). The interpretation of the law belongs to the judiciary, not the Legislature.
Conversely, courts should avoid "legislating from the bench" and should apply the law as written, provided such application does not lead to absurd consequences. See LSA-C.C. art. 9. That stated, one must acknowledge the so-called "societal expectations test" was utilized in the jurisprudence, albeit without statutory authority. Although jurisprudence is persuasive in analyzing statutory law in our civil law system, the courts are not the lawmakers. The sources of law, as stated in the Louisiana Civil Code, are legislation and custom. Judicial pronouncements are not sources of law. In our civilian jurisdiction, legislation, the solemn expression of the legislative will, is the superior source of law. Jurisprudence constante carries "considerable persuasive authority," but is not the law and must yield to legislative pronouncements. See Willis-Knighton Medical Center v. Caddo-Shreveport Sales and Use Tax Comm'n, 2005 WL 737481 at *14, 04-0473 (La.4/1/05), 903 So.2d 1071, 1088.
When one couples the prior judicial pronouncements with the legislature's recent amendment to LSA-C.C. art. 466 and the plurality decision in this matter, there exist a unique convergence of factors which *1110 mitigate in favor of applying this decision prospectively.
In Lovell v. Lovell, 378 So.2d 418 (La. 1979), this court decided not to give retroactive effect to its decision. Lovell involved a declaration of unconstitutionality of LSA-C.C. art. 160, an article which imposed the alimony obligation only on the husband. Citing Chevron Oil Company v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), the Lovell court listed three factors which should be considered in determining whether or not a decision should be given retroactive effect:
(1) the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed; (2) the merits and demerits must be weighed in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective application will further or retard its operation; and (3) the inequity imposed by retroactive application must be weighed.
Lovell, 378 So.2d at 421-22.
Upon consideration of these factors, I conclude the statutory interpretation in the instant case should not be applied retroactively. Although the statute is clear, courts have consistently considered the societal expectation test. No doubt there was some reliance on these judicial pronouncements. In this matter, as acknowledged in the opinion, the trial court, the court of appeal, and the parties did not address whether the societal expectation test should be applied, but how it should be applied. Given the recent legislative enactment and the fact this matter is a plurality decision, declaring the decision has prospective effect serves the salutary and practical purpose of promoting predictability and stability in the law, important considerations in the law of property. Given the prior judicial pronouncements and the legislative response to this decision, a weighing of the equities indicates this matter should be applied prospectively.
KIMBALL, J., concurring.
While I remain of the view that this court's plurality opinion was incorrectly decided and would grant rehearing in its totality to re-examine the proper interpretation of La. C.C. art. 466, I nonetheless agree with the decision to declare that the plurality opinion shall be given prospective effect only. I believe the decision should be applied prospectively only in this particular case in light of the legislature's swift passage of Senate Bill No. 196, the area of law impacted, and the fact that a plurality opinion is involved.
KNOLL, J., additionally concurring.
I additionally concur in the decision to grant a rehearing only to the extent the opinion, insofar as it relates to La. Civil Code Ann. art. 466, should not be given retroactive effect.
NOTES
[1] Willis-Knighton also claimed that it owed no local sales and use taxes on purchases of food for patients' meals and prescription drugs purchased and sold under the Pharmaceutical Vendor Program for Title XIX of the Social Security Act. These matters were settled prior to trial and are not at issue.
[2] LSA-R.S. 33:2717 was repealed by 2003 La. Acts, No. 73, § 3, effective July 1, 2003.
[3] Because the Commission did not apply for review of the court of appeal's ruling with respect to whether a refund was due for taxes paid under protest on sales of blood and blood products, that issue is final and is not before this court.
[4] Although the ordinance references tangible personal property, we have held that the term "tangible personal property" in this context is synonymous with corporeal movable as used in the Louisiana Civil Code. City of New Orleans v. Baumer Foods, Inc., 532 So.2d 1381, 1383 (La.1988). See also, Exxon Corp. v. Traigle, 353 So.2d 314, 316-17 (La.App. 1st Cir.1977), writ denied, 354 So.2d 1385 (La.1978), in which the court of appeal, in construing the language of LSA-R.S. 47:301(16) (which is substantially similar to the language of the ordinance at issue here) noted that the statute succeeds only in defining "tangible" which is apparently synonymous with "corporeal." The statute is silent as to the meaning of the phrase "personal property." The court concluded, quite appropriately, that considering that other states use their general property law to explain their sales tax law, it is "more likely that the legislature desired that this undefined term be defined in accordance with the general property law of Louisiana." Id.
[5] Other jurisdictions use the term "fixtures" to refer to component parts, and that term is in fact used in Chapter 9 of Title 10 of the Revised Statutes; however it is specifically defined as component parts within the meaning of LSA-C.C. arts. 463, 465, 466, and 467. See LSA-R.S. 10:9-102(a)(41). In connection with commercial transactions, the fewer items that are considered component parts, the greater the flexibility for an entity seeking to secure financing. Should an entity wish an item to be a component part in a commercial setting, for whatever advantage may inure, Article 467 provides that option.
[6] See, e.g., Taylor S. Carroll, Note, Prytania Park Hotel Limited v. General Star Indemnity Company: A Misapplication of Civil Code Article 466, 60 La. L.Rev. 947 (2000); Amy Allums, Note, Prytania Park Hotel Ltd. v. General Star Indemnity Co.: How a Small Hotel Made a Big Difference in the Component Part Concept, 74 Tul. L.Rev. 1543 (2000); A.N. Yiannopoulos, Of Immovables, Component Parts, Societal Expectations, and the Forehead of Zeus, 60 La. L.Rev. 1379 (2000); 2 A.N. YIANNOPOULOS, LOUISIANA CIVIL LAW TREATISE: PROPERTY § 142.5 (4th ed.2001).
[7] The classification of things affects not only property law, but also carries consequences in the fields of obligations, family law, successions, civil procedure, taxation, criminal law, and conflict of laws. See Expose des Motifs, 3 La.Civ.Code Ann. 3, 9 (West 1980).
[8] Pre-revision Articles 467 and 469 provided:

Art. 467.
Wire screens, water pipes, gas pipes, sewerage pipes, heating pipes, radiators, electric wires, electric and gas lighting fixtures, bathtubs, lavatories, closets, sinks, gasplants, meters and electric light plants, heating plants and furnaces, when actually connected with or attached to the building by the owner for the use or convenience of the building are immovable by their nature. Art. 469.
The owner is supposed to have attached to his tenement or building forever such movables as are affixed to the same with plaster, or mortar, or such as can not be taken off without being broken or injured, or without breaking or injuring the part of the building to which they are attached.
[9] The court quoted the following from the Expose des Motifs:

Lines of demarcation [between movables and immovables] are ordinarily drawn in accordance with prevailing ideas in society.... In contemporary civil law, the distinction rests, in principle, on physical notions of mobility and on "inherent" characteristics of things.
Equibank, 749 F.2d at 1179.
[10] For a thorough discussion of the Equibank case, see, M. Charles Wallfisch, Note, PropertyPermanent AttachmentThe Chandeliers Case, 61 Tul.L.Rev. 440 (1986).
[11] See, e.g., In re Chase Manhattan Leasing Corp., 626 So.2d 433 (La.App. 4 Cir.1993), writ denied, 630 So.2d 797 (1994); Lakeside National Bank of Lake Charles v. Moreaux, 576 So.2d 1094 (La.App. 3 Cir.1991); Berot v. Norcondo Partnership, 544 So.2d 508 (La.App. 5 Cir.), writ denied, 550 So.2d 633 (1989); American Bank & Trust Co. v. Shel-Boze, Inc., 527 So.2d 1052 (La.App. 1 Cir.), writ denied, 532 So.2d 155 (1988). See also, United States Environmental Protection Agency v. New Orleans Public Service, Inc., 826 F.2d 361 (5th Cir.1987); Coulter v. Texaco, Inc., 117 F.3d 909 (5th Cir.1997).
[12] Symeon Symeonides, Developments in the Law, 1984-1985: Property, 46 La. L.Rev. 655 (1986).
[13] In Boggs, the federal district court interpreted the two paragraphs of Article 466 as being interdependent rather than separate, with paragraph one items having to meet the test of permanent attachment set forth in paragraph two. The court concluded, without reference to a societal expectations analysis, that an offshore rig was not a component part of a platform because it could be removed without substantial damage. Boggs, 720 F.Supp. at 75.
[14] See, e.g., A.N. Yiannopoulos, Of Immovables, Component Parts, Societal Expectations, and the Forehead of Zeus, 60 La. L.Rev. 1379 (2000); 2 A.N. YIANNOPOULOS, LOUISIANA CIVIL LAW TREATISE: PROPERTY § 142.5 (4th ed.2001); Taylor S. Carroll, Note, Prytania Park Hotel Limited v. General Star Indemnity Company: A Misapplication of Civil Code Article 466, 60 La. L.Rev. 947 (2000).
[15] However, as discussed infra, it is conceivable that such items could be classified as "integral" and thus component parts pursuant to LSA-C.C. art. 465, depending upon the particular facts and circumstances of the case. See, e.g., Monroe Automobile & Supply Co. v. Cole, 6 La.App. 337 (2d Cir.1927), cited in the Comments to Article 465, suggesting in dicta that items such as doors, window sashes, and blinds might be so incorporated into a building as to become a component part of it.
[16] To Louisiana judges, prior judicial decisions are nothing more than interpretations of law. Albert Tate, Jr., Civilian Methodology in Louisiana, 44 Tul.L.Rev. 673, 678 (1970). As a result, prior errors in judicial interpretation do not "insulate" the judge from returning to legislation itself to determine its correct meaning. Id.
[17] Although Louisiana has never adopted the common law doctrine of stare decisis, it has followed the civilian doctrine of jurisprudence constante. The chief distinction between stare decisis and jurisprudence constante is that a single case affords sufficient foundation for stare decisis, while a series of adjudicated cases, all in accord, form the basis for jurisprudence constante. Doerr, infra, 00-0947 at p. 14, 774 So.2d at 129.
[18] We also note in Boggs a federal district court applied the substantial damage analysis. See footnote 13, supra.
[19] See Exxon Corporation v. Foster Wheeler Corporation, 2000-2093 (La.App. 1 Cir. 12/28/01), 805 So.2d 432, 438, writ denied, 02-0261 (La.3/28/02), 812 So.2d 633, wherein, in a concurring opinion Judge Fitzsimmons notes that the societal expectations analysis "lacks predictability for lawyers and litigants." See also, Lovett, 48 Loy.L.Rev. at 712, in which Professor Lovett describes the societal expectations analysis as requiring the judge and attorney to "engage in an a textual and often subjective inquiry," that, in hard cases, "can cause serious evidentiary problems."
[20] There is a third category of component parts established in LSA-C.C. art. 467: immovables by declaration. However, as there was no declaration of immobilization filed for registry in the conveyance records of Caddo Parish, this article does not come into play in this case and, as a result, is not discussed. Nonetheless, under the article, had Willis-Knighton wanted the nuclear cameras to be classified as component parts, it could have easily effected such a classification by complying with the article.
[21] This absence of definition is in contrast to Article 466, which specifically defines the term "permanent attachment."
[22] As Professor Yiannopoulos explains: "Buildings are not mere skeletons and a framework of walls and roof; balconies, lifts, partitions, and mezzanines, resulting from the incorporation of materials into a building, are its component parts." 2 A.N. YIANNOPOULOS, LOUISIANA CIVIL LAW TREATISE: PROPERTY § 142 (4th ed.2001).
[23] To the contrary, the cameras more closely resemble the classes of things enumerated in Article 466 ("plumbing, heating, cooling, electrical or other installations") than building materials. The cameras are installations that are attached to, rather than incorporated in, a building.
[24] We note the cameras are only removed when they become obsolete, making the market for the cameras, for all practical purposes, limited.
[25] The relevant time period in this case is that period in which Willis-Knighton paid its taxes under protest: from December 1, 1997, through June 30, 2003.
[26] During the time period relevant to this litigation, LSA-R.S. 47:305(D)(4) specifically removed certain enumerated items from the exemption from both state and local sales and use taxes for which Subsection D(6) otherwise provided, stating:

The exemption for food, drugs, orthotic and prosthetic devices, and wheelchairs and wheelchair lifts prescribed by physicians or licensed chiropractors for personal consumption or use; for patient aids prescribed by a physician or licensed chiropractor for home use; and ostomy, ileostomy or colostomy devices, or other appliances including catheters or related items required as the result of any surgical procedure by which an artificial opening is created in the human body for the elimination of natural waste applies only to sales taxes imposed by the state of Louisiana and does not apply to such taxes authorized and imposed by any school board, municipality, or other local taxing authority notwithstanding any other provisions of law to the contrary, and specifically, but not exclusively, R.S. 33:2716.1.
[27] The statute was repealed by 2003 La. Acts No. 73, effective July 1, 2003.
[28] The legislature amended Subsection 305(D)(1)(s) by 2003 La. Acts, No. 73, § 1. Effective July 1, 2003, the medical device exemption now reads:

Solely for purposes of the state sales and use tax, any and all medical devices used exclusively by the patient in the medical treatment of various diseases or administered exclusively to the patient by a physician, nurse, or other health care professional or health care facility in the medical treatment of various diseases under the supervision of and prescribed by a licensed physician. [(Emphasis added).]
[29] Willis-Knighton argues that between 1973 and 1978, the legislature enacted a series of health care exemptions, each time specifically providing that the exemptions would not apply at the local level, and codifying that intention in LSA-R.S. 47:305(D)(4). For example, LSA-R.S. 47:305(D)(4) was amended in 1973 to include drugs, wheelchairs, and prosthetic devices in the list of items not exempt from local sales and use tax; in 1974 to include patient aids; and in 1978 to include ostomy, ileostomy, and colostomy devices. However, in La. Acts 1985, No. 901, the legislature created the medical device exemption and in doing so did not expressly limit the exemption to state sales and use tax. Willis-Knighton argues that the legislature could have easily limited the applicability of the medical device exemption to state sales and use tax had that been its intention, as it did when enacting the previous health care exemptions. The fact that it did not do so, Willis-Knighton contends, is evidence that it intended the exemption to extend to local taxing authorities. The problem with this argument, however, is that it ignores the subsequent amendment of LSA-R.S. 47:305(D)(6) in 1991 and the legislature's clear statement therein that as to exemptions placed in the statute subsequent to the effective date of Act 205 of 1978, like the medical device exemption, such exemptions must specifically provide that they are applicable to a local taxing authority to apply at the local level.
[1] In fact, the author of the majority opinion states in his additional reasons that "[w]hile the first paragraph of the article contains an illustrative list of items that can be permanently attached, those items must satisfy the test of permanent attachment to be component parts under Article 466."
[2] In my view, these items generally could not be classified as a component part under La. C.C. art. 465 as they are not incorporated into the immovable to which they are attached so as to become an integral part, i.e., in the words of the majority, they do not "lose their identity as separate things and become merged in the building to the extent that they become a part of it." Op. at 1091.
[1] Prytania Park Hotel, Ltd. v. General Star Indem. Co., 179 F.3d 169 (5th Cir.1999).
[1] See, footnote 15 of majority opinion, which suggests that items such as doors might be classified as "integral" parts of an immovable, and thus component parts pursuant to LSA-C.C. art. 465, depending upon the particular facts and circumstances of the case.
[2] Indeed, in Peter S. Title, Louisiana Real Estate Transactions, § 1:13 and 16 (2d ed.2004) the author includes the following practice tips for practitioners: "Disputes between a buyer and seller in a real estate transaction as to whether a particular item has been transferred by the sale of the real estate are not uncommon, and in order to avoid disputes and litigation, it is advisable to delineate specifically in the purchase agreement the particular items attached to or located on the real estate, such as chandeliers and window units, that will, or will not, be transferred in the sale." ... "Art. 467 is useful for a lender obtaining a real estate mortgage as security. Such a lender may require that the borrower execute and file a declaration of immobilization so as to ensure that machinery, appliances and equipment that would otherwise be movable will be subject to the real estate mortgage."
[3] During this state's infancy, the people of Louisiana steadfastly resisted the importation of the common law as our legal system, rejecting the role of the judge as a lawmaker and opting instead to retain the civil law. In their struggle to retain a civilian heritage, the people of Louisiana stood firm against the demands of an imported common law trained governor, William C.C. Claiborne, and the President of the United States, Thomas Jefferson. This heritage should not be abandoned now by elevating jurisprudence constante to a level that rivals stare decisis.

This struggle to retain the civil law heritage is chronicled by Professor Yiannopoulos. See A.N. Yiannopoulos, Requiem for a Civil Code: A Commemorative Essay, 78 Tul. L.Rev. 379, 383-384 (2003). The article quotes from a manifesto published in New Orleans in 1806 which is "an elegant, eloquent, and passionate plea for the preservation of the civilian tradition that continues to be relevant (and is reproduced in full every year in the annual update to the Louisiana Civil Code)." 78 Tul. L.Rev. at 384-385. The manifesto states, in part: "We certainly do not attempt to draw any parallel between the civil law and the common law; but in short, the wisdom of the civil law is recognized by all Europe; and this law is the one which nineteen-twentieths of the population of Louisiana know and are accustomed to from childhood, of which law they would not see themselves deprived without falling into despair." 78 Tul. L.Rev. at 385. Almost 200 years later, this court should not ignore that passionate plea.
[4] Indeed, the evidence establishes that the cameras become obsolete and have to be replaced. One of the cameras at issue is just such a replacement camera.
[1] Senate Bill No. 196 reads, in pertinent part:

Art. 466. Component parts of buildings or other constructions an immovable
Things permanently attached to a building or other construction, such as plumbing, heating, cooling, electrical or other installations, an immovable are its component parts.
Things are considered permanently attached if they cannot be removed without substantial damage to themselves or to the immovable to which they are attached. Things, such as plumbing, heating, cooling, electrical or other installations, are component parts of an immovable as a matter of law.
Other things are considered to be permanently attached to an immovable if they cannot be removed without substantial damage to themselves or to the immovable or if, according to prevailing notions in society, they are considered to be component parts of an immovable.
Senate Bill No. 196 also provides:
Section 2. This Act shall apply to existing immovables and shall be used in any determination of whether a thing is a component part, but no provision may be applied to divest already vested rights or to impair obligations of contracts.
Senate Bill No. 196 goes on to provide:
According to legislative intent, the two Paragraphs of Article 466 contemplate distinct tests for the classification of things as component parts of building or other constructions. The things that are indicatively enumerated in the first Paragraph of Article 466 are component parts as a matter of law. All other things are considered to be permanently attached and, therefore, component parts of a building or other construction under the second Paragraph of Article 466, if they cannot be removed without substantial damage to themselves or to the immovable. Further, Louisiana courts have correctly superimposed on the two Paragraphs of Article 466 the realistic test of "societal expectations." Things attached to an immovable may be component parts of the immovable or may remain movables depending on societal expectations, namely, prevailing notions in society and economy concerning the status of those things.
Section 4. This Act is intended to clarify and re-confirm interpretation of Louisiana Civil Code Article 466, including the "societal expectations" analysis, that prevailed prior to the decision in Willis-Knighton Medical Center v. Caddo Shreveport Sales, 903 So.2d 1071, 2005 WL 737481, XXXX-XXXX (La.4/1/05). [Words which are struck through are deletions from existing law; words in boldface type and underscored are additions.]